COMMONWEALTH vs. GERALD CLEMENTE.

No. 86-1291.

Middlesex. October 21, 1987. — January 6, 1988.

Present: PERRETTA, CUTTER, & SMITH, JJ.

*Breaking and Entering. Larceny. Building. Practice, Criminal,* Duplicitous
convictions, Duplicitous punishment, Indictment, Disclosure of evi-
dence. *Joint Enterprise. Evidence,* Other offense.

The evidence at a criminal trial that the defendant broke into a store adjacent
to a bank and from there broke and entered the vault of the bank with
the intent to commit larceny was sufficient to support separate convictions
for breaking and entering with intent to commit a felony with respect
to the store as well as the bank, and consecutive sentences imposed for
each conviction were proper. [233-237]

Evidence at a criminal trial was sufficient to warrant jury instructions on the
theory of joint venture, and such instructions were not shown to be
erroneous as given. [238]

Denial of a criminal defendant's motion for a mistrial was proper where
the alleged violations of discovery orders by the Commonwealth were
minor and not shown to be prejudicial to the defendant. [238-239]

The judge at a criminal trial properly exercised his discretion to admit evi-
dence of the defendant's possible commission of other criminal acts,
which was relevant for other evidentiary purposes. [239-240]

INDICTMENTS found and returned in the Superior Court De-
partment on December 6, 1985.

The cases were tried before *Robert A. Barton,* J.

*Lillian A. Wilmore* for the defendant.

*Fredric L. Ellis,* Assistant District Attorney, for the Com-
monwealth.

CUTTER, J. During the Memorial Day weekend (May 24-27,
1980, inclusive, sometimes hereafter "the 1980 Memorial Day
weekend"), the premises of the Depositors Trust Company
("the bank") in Medford and the adjacent premises (in the same
block structure) of Burns Optical and Hearing Aid Center

("BOC") were entered by persons for some time unknown. Substantial sums of money were taken from the bank's vaults by the intruders, who gained entry to the bank through BOC's premises.

On December 6, 1985, indictments[1] were returned against Clemente, then a captain in the police force of the Metropolitan District Commission (MDC). On March 18, 1986, Clemente (after twelve days of trial before a Superior Court judge and a jury) was found guilty on each of the indictments for breaking and entering and on one count of larceny.

The judge imposed sentences: (a) on Indictment 3632, eighteen to twenty years for breaking and entering the premises of BOC; (b) on Indictment 3633, a consecutive twelve to twenty years for breaking and entering the bank; and (c) on Indictment 3636, a three to five year sentence for larceny, concurrent with that for breaking and entering the bank.[2] Clemente has appealed in each instance.

A. *General Background.*

There was evidence which would permit the jury to make the following findings. Much of this evidence was furnished by Joseph Bangs, who became a witness called by the Commonwealth under a grant of immunity. He was subjected to a comprehensive cross-examination by Clemente's counsel.

---

[1] The indictments charged as follows: that Clemente during the 1980 Memorial Day weekend (a) No. 85-3632: "did break and enter in the night time the building of . . . [BOC] with intent to commit a felony"; (b) No. 85-3633: "did break and enter in the night time the building of . . . [the bank] with intent to commit a felony"; (c) No. 85-3634: "did break in the night time a vault containing money, bonds and/or other valuables in a building of . . . [the bank] with intent to commit a larceny or felony"; (d) No. 85-3635: "did break in the night time diverse safes, vaults, or other deposit of money, bonds or other valuables in the building of . . . [the bank] with the intent to commit larceny of the property . . . [the bank], Dorothy Eckstein, Fredda Goldstein, and others"; and (e) No. 85-3636: for larceny of "money and property of the value of more than one hundred dollars, of the property of . . . [the bank], Dorothy Eckstein, Fredda Goldstein, and others." Indictments charging conspiracy (Nos. 85-3637 and 3638) were not pressed by the Commonwealth in this proceeding.

[2] All sentences were to M.C.I., Cedar Junction. The convictions under Indictments Nos. 85-3634 and 85-3635 were placed on file with the consent of Clemente.

Clemente in the 1970's became friendly with Bangs, then a patrolman in the MDC police force. Clemente in the summer of 1979 asked Bangs for assistance in disposing in the Charles River of Clemente's Cadillac automobile in order to collect insurance on it. Bangs told Clemente that Boston Harbor would be a better place to use. Bangs and his friend, Francis ("Brother") O'Leary, did dispose of the vehicle. When the disposal of the automobile was reported to Clemente, he replied, "I owe you and Brother a favor." He then "suggested to . . . [Bangs] that if we found a place that could be B&E'd in . . . Medford . . . he would render his assistance."

Bangs and O'Leary looked over Medford and suggested a TV store as a target. Instead of the TV store, Clemente proposed the bank (Depositors Trust) as a target and obtained from Thomas Doherty, a sergeant of the Medford police, blueprints of the bank premises and vault.

There was extended testimony by Bangs about the preparations (in which Clemente participated actively) for the penetration of the BOC premises and the bank and the persons[3] involved in those preparations.[4]

Shortly after midnight of the night of Saturday May 24-25, 1980, some of the participants in the proposed breaks (Barrett, Holmes, O'Leary, and Bangs) gathered at premises in Somerville, where O'Leary lived. Clemente arrived there with a station wagon, supplied by Doherty. Those present loaded it with the equipment and tools to be used in the breaks. Doherty,

---

[3]The persons (in addition to Clemente, Bangs, Doherty, and O'Leary), who became involved in preparing for the break-ins included Arthur (Bucky) Barrett, introduced to Bangs "as an alarm expert," and Kenneth Holmes, an expert on safes.

[4]These preparations included visits to the area where the bank was situated, obtaining from Thomas Doherty the blue prints mentioned in the text, and rental by Doherty of a safe deposit box so as to visit the vault itself and make a diagram of it. Consideration was given to how Doherty, as a Medford police sergeant, could deter interruptions of the breaks by police patrols, arranging for identification of alarm wires and preparation of an alarm by-pass box, collection of equipment, tools, and vehicles (in part at least by O'Leary), and a "dry-run" of the operation. There were meetings to discuss the procedures.

then on duty, called the group after midnight to tell them to proceed. Clemente drove the group to a point near the bank.

After a by-pass box had been attached to the alarm system of the bank, they unloaded the equipment into the cellar under the BOC premises, keeping in touch by radio with Doherty outside the bank, and then proceeded to break into the BOC premises, taking at least some of the equipment with them. Clemente was with the intruders at all times. They drilled a hole from a loft in the BOC premises to a point in the bank above the bank's vault. There, by the use of drills and dynamite, they made a hole in the top of the bank's vault, which they (or some of them) entered. Safes containing bank money and various safe deposit boxes were opened.

It was decided to leave the bank vault during the daylight hours and to return that night when Doherty would be available to protect them from detection. Currency, money, jewelry, and precious stones were taken and removed, apparently through the holes in the roof of the vault and the wall separating the bank premises from the BOC premises. They left the bank premises about 5:30-6:30 A.M.[5]

After leaving the bank that first night, they all went to Bangs's home in Tewksbury. Clemente and Doherty had the money and jewelry. Bangs was in his own vehicle. At Bangs's house, they divided the proceeds of the first night's efforts. They separated after a few hours.

On the second night (Sunday, May 25, to Monday, May 26), Clemente, after making various checks to ascertain whether the break of the night before had been discovered, drove Bangs, O'Leary, Holmes, and Barrett in a station wagon to the area of the bank. Then there followed apparently essentially the same procedure as on the first night.[6] The intruders,

---

[5] Bangs testified that, when they left the bank vault, they "took all the equipment" and never "left any tools . . . there at any time."

[6] That procedure seems to have been to descend the stairs behind a Brigham's store into a common basement hallway under that store and the BOC premises, break through the locked door leading to the first floor of the BOC premises, then enter the loft, and go through the holes cut into the bank's premises and down into its vault. The evidence, the view taken by

however, took into the bank area fewer tools than on the first night and at least one more radio. That night they remained in the bank vault until early Monday morning, when they left for O'Leary's house in Somerville to split the additional proceeds of the second night in the bank.

A similar procedure appears to have been followed on the third night (Monday, May 26, to Tuesday, May 27), except that Barrett left on Monday for Florida to strengthen his alibi. Because of his departure, arrangements were altered. Bangs, although on MDC police duty that night, took Doherty's place outside the bank. Clemente, Doherty, Holmes, and O'Leary went inside the bank. Clemente himself went into the vault. The intruders left in the early morning for O'Leary's house in Somerville to divide up the spoils of the third night. Holmes took Barrett's share to hold for him.

Other testimony was largely consistent with Bangs's testimony. Additional parts of the evidence are mentioned in the discussion below of each principal contention made in Clemente's behalf.

B. *Alleged Duplicity or Multiplicity of Sentences.*

· Clemente contends that the events proved by the Commonwealth constituted only one continuing offense, amounting to an essentially single culpable act. Clemente also contends that the sentences imposed violated the double jeopardy clause of the Fifth Amendment to the Constitution of the United States, citing *North Carolina* v. *Pearce,* 395 U.S. 711, 717 (1969), and the dissent (at 369-374) in *Missouri* v. *Hunter,* 459 U.S. 359 (1983).

The statute with respect to breaking and entering, allegedly violated by Clemente, as in effect in 1980, was G. L. c. 266, § 16, as appearing in St. 1974, c. 462, § 2, which is set out in the margin.[7]

---

the jury, and exhibits showed that, looking across High Street in Medford, a Brigham's coffee shop was on the corner of High Street and Governor's Avenue. Next to the right (east) was a barber shop. Next to that was BOC, which in turn was next to the bank.

[7]"Whoever, in the night time, *breaks and enters a building . . .,* with *intent to commit a felony,* or who attempts to or does break, burn, blow up or

The Massachusetts cases give no certain guide to the unusual situation presented by the present record. In *Commonwealth v. Donovan,* 395 Mass. 20, 27-31 (1985), the defendants (at 29) "hatched a *single* plan to place a *single* phony night deposit box on the wall of a *single* bank. The box was only placed on the wall for a *single* time on a *single* evening" (emphasis supplied). The opinion (at 30) concluded that "only a single crime ha[d] been committed even though the larcenous scheme involve[d] the taking of property from a number of owners." The opinion expressly distinguished (at 31) *Commonwealth v. Levia,* 385 Mass. 345, 348-351 (1982), where the court affirmed two armed robbery convictions of a defendant who had robbed two individuals in the course of a single criminal episode. This was on the basis that, where "a single criminal transaction gives rise to crimes of violence . . . against several victims, then multiple indictments (and punishments) are appropriate."

The *Donovan* opinion (395 Mass. at 29) relied on *Commonwealth v. Stasiun,* 349 Mass. 38, 44-45 (1965), which dealt with a "wrongful criminal solicitation" of a bribe "from one person of one payment for one favor." The *Stasiun* opinion recognized (at 44), "the crime of requesting a single bribe may . . . have a continuing aspect," in the sense (at 45) that the solicitation may involve "protracted negotiations."[8] The *Stasiun* opinion also recognized (at 45) that, under the statute there applied (G. L. c. 268, § 8, now c. 268A, §§ 2, 3), each separate

---

otherwise injure or *destroy a safe, vault,* or other depository of money, bonds or other valuables *in any building or place, with intent to commit a larceny or felony, whether he succeeds or fails in the perpetration of such larceny or felony,* shall be punished by imprisonment in the state prison for not more than twenty years . . . ." (emphasis supplied). Section 16 later was further amended by St. 1985, c. 312, § 1.

[8] In the *Stasiun* case, 349 Mass. at 45, the opinion made comment, "It has been held elsewhere that where it appears that successive takings are actuated by a single continuing criminal impulse or intent or are pursuant to the execution of a general larcenous scheme, such successive takings constitute a single larceny, regardless of the extent of the time which may have elapsed between each taking" (citing authorities other than Massachusetts decisions).

solicitation could have been charged as a separate offense. In the particular circumstances that was held to be "inconsequential" in dealing with the continuing aspect of negotiations. See and compare *Commonwealth* v. *Winter,* 9 Mass. App. Ct. 512, 522-528 (1980, dealing with two simultaneous continuing conspiracies, both with the same purpose).

Perjury offenses have been dealt with under the applicable statute (G. L. c. 268, § 1) as governed by a strong legislative policy, shown by "the deterrent purpose of the statute and the severity of the penalties which it provides," as justifying the conclusion that, "where the other elements of the offenses are present, a separate perjury is committed each time a wilful false statement is made except where such statements are 'substantially identical'" (citations omitted). See *Commonwealth* v. *Gurney,* 13 Mass. App. Ct. 391, 397-404 (1982), and the numerous authorities cited. See also *Commonwealth* v. *Cameron,* 385 Mass. 660, 670-671 (1982), holding that consecutive sentences could be imposed for a second conviction of arson of a building separate from the building the burning of which was the underlying felony on a conviction of murder.[9]

The indictments (other than those placed on file) for the felony (G. L. c. 266, § 16, see note 7, *supra*) of breaking and entering a building with the intent to commit a felony were each authorized by § 16. With respect to each there was evidence which could meet the statutory elements.

Indictment No. 3632 charged that there was a break and entry of the BOC building with the intent to commit a felony. There was evidence that all the intruders intended when they entered the BOC store to break into the bank to commit larceny in the bank. That break into the bank which involved cutting through the wall between BOC and the bank was itself a felony which took place at least mostly in the BOC building.[10]

---

[9] Such decisions are to be contrasted with a case involving simultaneous possession of more than one item of allegedly "obscene" matter, where it was held that only one offense was committed. See *Commonwealth* v. *Beacon Distributors, Inc.,* 14 Mass. App. Ct. 570, 573-575 (1982), and cases cited. Compare, as to narcotics offenses, *United States* v. *Chagra,* 653 F.2d 26, 26-34 (1st Cir. 1981).

[10] The 1974 form (note 7, *supra*) of § 16, does not contain any apparent requirement that the breaking and entering must be with the intention to com-

Indictment No. 3633 (see note 1, *supra*) charged a breaking and entry into the bank building with the intent to commit a felony therein. There was very complete evidence of intention to steal from the bank and others. The evidence of breaking into and entry of the bank was fully proved. The jury could have found that the initial breaks because of the separate characteristics[11] of the BOC store and of the bank were separate

mit a felony within the same building into which the break was made. That may have been a requirement (see St. 1804, c. 143, §§ 4 and 5) prior to the Revised Statutes c. 126, § 11 (1836), but since then the successive enactments (St. 1839, c. 31; St. 1851, c. 156, § 1; also St. 1860, c. 161, § 12; Pub. St. c. 203, § 12 (1882); R.L. c. 208, § 16 (1902); St. 1943, c. 344, § 1) have contained no explicit requirement that the intended felony be within the same building originally entered. Clemente seems to concede that at least one indictment was valid charging the entry of the bank through the BOC store, citing *People* v. *Wright,* 206 Cal. App. 2d 184 (1962), and that the omission from § 16 of the word "therein" permits charging as the intention of a breaking into a building the commission of a felony in an adjacent building reached through the building first entered. See Perkins & Boyce, Criminal Law 268-270, 273 (3d ed. 1982); 3 Torcia, Wharton's Criminal Law § 341 (14th ed. 1980). See also, as to the *Wright* case, *People* v. *Nunley,* 168 Cal. App. 3d 225, 231 (1985). For a decision with a similar result, see *Robles* v. *State,* 664 S.W.2d 91, 94 (Tex. Crim. App. 1984). See also *Moreno* v. *State,* 328 So. 2d 38 (Fla. Dist. Ct. App. 1976). Compare *State* v. *O'Rourke,* 121 R.I. 434, 436-438 (1979). This area (of what are generally called "burglary" statutes, see Nolan, Criminal Law §§ 401-409 [1976 & Supp. 1987]) gives rise to a great variety of views. See discussion in Model Penal Code, part II, § 221.1, at 60-84 (adopted 1962, printed 1980). It may be that some legislative improvement of § 16 and related provisions would be in the public interest.

[11] Recent Massachusetts cases have indicated that the multiple characteristics of many modern apartment, business, and office buildings may be recognized in criminal cases involving burglary situations. See, e.g., *Commonwealth* v. *Correia,* 17 Mass. App. Ct. 233, 236 (1983, motel noted as a dwelling house under G. L. c. 266, § 14); *Commonwealth* v. *Goldoff,* 24 Mass. App. Ct. 458, 461-464 (1987). See generally Annotation, 78 A.L.R. 2d 778 (1961). The jury had taken a view of the block in which the bank stood. They had opportunity to evaluate the situation, i.e., in ordinary present day conditions, and the BOC premises above the cellar and the bank could reasonably be regarded (as a matter of general understanding in 1980) as separate buildings. In any event, as to each of these premises, under *Commonwealth* v. *Kalinowski,* 360 Mass. 682, 683-686 (1971), the prosecution was required to prove as to ownership only that Clemente entered a building or part of premises not his own.

Clemente's counsel, by motion on January 7, 1986, brought to the attention of the trial judge the issue of possible multiplicity of charges and sen-

breaks, even on the first night of the 1980 Memorial Day weekend. We hold that § 16, in terms, gave legislative authority to prosecute each break separately and impose a separate consecutive sentence for each conviction.[12] Compare the restricted criminal activity confined to a single night depository on a single night considered in the *Donovan* case, 395 Mass. at 29. Compare *Brown* v. *Ohio,* 432 U.S. 161, 166-170 (1977); *Sanabria* v. *United States,* 437 U.S. 54, 69-78 (1978); *Whalen* v. *United States,* 445 U.S. 684, 692-695 (1980). Compare also *Missouri* v. *Hunter,* 459 U.S. at 365-369. The BOC store and the bank need not be regarded as parts of the same building but may be dealt with under § 16 as separate buildings. See and compare *Commonwealth* v. *Tarrant (No. 1),* 14 Mass. App. Ct. 1020, 1021 (1982), and *Tarrant* v. *Ponte,* 751 F.2d 459, 462-466 (1st Cir. 1985).[13]

---

tences. Although that motion appears to have been denied without prejudice, the question whether more than one "building" was involved in this situation should be considered under the principle stated in the *Donovan* case, 395 Mass. at 27-28. Compare *Commonwealth* v. *Keevan,* 400 Mass. 557, 563-564 (1987).

[12] The intruders withdrew entirely from both the BOC building and the bank after each night of pillage and split the spoils of the preceding night at once. They made checks to ascertain whether the breaks of the prior night or nights had been detected before starting out for a new night's venture. The indictments do not charge that each night of invasion could be viewed as constituting a new set of offenses. Thus we have no occasion to consider that aspect of this case. Nevertheless, the events occurring on any one of the three nights in either building could be viewed by the jury as satisfying (in whole or in part) the charge either in Indictment No. 3632 or Indictment No. 3633 relating to the particular building mentioned in that indictment.

[13] A separate sentence may be imposed for conviction of the substantive offense of larceny (Indictment No. 3636, see note 1, *supra*) in addition to a sentence for a violation of G. L. c. 266, § 16, for entering a building with intent to commit a felony (including that larceny). See *Commonwealth* v. *Ford,* 397 Mass. 298, 302 (1986). The sentence on Indictment No. 3636 was originally made concurrent with the sentence under § 16 on Indictment No. 3633, which in turn was to be consecutive to the sentence on Indictment No. 3632. If for any reason the sentence on Indictment No. 3633 should be set aside, the larceny sentence on the conviction on Indictment No. 3636 may be made expressly consecutive to the sentence on Indictment No. 3632.

## C. *Instructions on Joint Venture.*

The evidence already summarized plainly warranted a finding that a "joint venture" existed. The indictments, especially when read with the bills of particulars, show that the Commonwealth was proceeding upon charges involving a joint venture by the participants in the events of the 1980 Memorial Day weekend. At and before trial, defense counsel objected to instructions on the theory of "joint" venture. Such instructions have not been shown to have been erroneous in substance, and were properly given in the circumstances under the relevant Massachusetts cases. *Commonwealth* v. *Dabrieo,* 370 Mass. 728, 745 (1976). *Commonwealth* v. *Dyer,* 389 Mass. 677, 683-684 (1983). *Commonwealth* v. *Della Iacono,* 20 Mass. App. Ct. 83, 86-87 (1985).

## D. *Denial of Motion for Mistrial Because of Minor Violations of Discovery Orders.*

In behalf of Clemente, it is contended that a mistrial should have been granted because of the prosecutor's failure to disclose in advance of trial certain statements of witnesses of a type which should have been disclosed. No bad faith on the part of the prosecutor is apparent on this record. See the *Donovan* case, 395 Mass. at 24-25. In the circumstances,[14] the trial judge acted well within his discretion in denying a mistrial, for violations of discovery orders not shown to have been significantly

---

[14] Clemente's counsel bases his contention that there should have been a mistrial on the following episodes: (1) Bangs testified that Clemente had explained to him in June of 1980 that he (Clemente) had not admitted an FBI agent to his house, because there was a stolen television there. Defense counsel did not accept the offer of a curative instruction and made no motion to strike the objectionable evidence or ask for a continuance to revise his strategy. (2) Barbara Hickey (see note 15, *infra*) had testified that Clemente had said to her before the burglaries that Doherty had plans of a particular bank. No motion to strike the evidence or for a continuance was made. (3) Barbara Hickey testified that Clemente, before she testified before a Federal grand jury in 1981 (when, she said, she had been granted some immunity), had told her that she should adhere to a statement signed by her in 1980, and that if she "didn't do what he told . . . [her] to do, there were people [who] could get very rough . . . and hurt [her]." The judge denied a mistrial. There was some indication that the prosecution had made disclosure of these conversations although in somewhat general form.

prejudicial to Clemente, especially in view of the strong case against him.

None of the matters (see note 14, *supra*) was exculpatory in character. Viewed in relation to the whole case, the matters were trivial and related to details. Some of the material was cumulative of trial testimony. Defense counsel did not make use of measures recommended by applicable decisions in such situations. The total deletion of the matters urged as a basis for a mistrial would not have significantly weakened the Commonwealth's case. See the discussion in *Commonwealth* v. *Cundriff,* 382 Mass. 137, 149-151 (1980); *Commonwealth* v. *Lapka,* 13 Mass. App. Ct. 24, 29-31 (1982).

E. *Admission of Evidence Tending to Show Clemente's Involvement in Other Criminal Activities.*

Evidence of a criminal defendant's prior "bad acts" or criminal behavior is not admissible to prove his propensity to commit the crime for which he is being tried. *Commonwealth* v. *Drew,* 397 Mass. 65, 79-80 (1986). "If, however, such evidence is relevant for some other purpose, it is not rendered inadmissible merely because it indicates the possible commission of another offense." *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 269 (1982), where, in the circumstances then before the Supreme Judicial Court, it was pointed out (at 270) that any "prejudice likely to be generated by the admission of this ['bad act'] evidence did not so outweigh its probative value that it was error to admit it." See Liacos, Massachusetts Evidence 421-422 (5th ed. 1981 & Supp. 1985 at 189-191). See also *Commonwealth* v. *Silva,* 401 Mass. 318, 322-323 (1987). The determination whether to admit such testimony is essentially within the discretion of the trial judge. We hold that

there was no abuse of discretion by the trial judge in admitting evidence concerning the matters listed in the margin.[15]

*Judgments affirmed.*

---

[15]The evidence which Clemente contends to have been significantly prejudicial consists of the following items: (1) The evidence of Bangs about the insurance fraud perpetrated by Bangs and O'Leary, placing Clemente's Cadillac automobile in Boston Harbor. This evidence was inextricably tied into the events of the 1980 Memorial Day weekend by Bangs's testimony that, as a result of this "favor," Clemente undertook to participate with Bangs and O'Leary in a burglary in Medford. See *Commonwealth* v. *Borans,* 379 Mass. 117, 147 (1979). The trial judge gave appropriate limiting instructions. (2) Various pieces of evidence (with respect to Clemente's efforts to control the testimony of Barbara Hickey [see note 14, *supra*]), with whom Clemente (as an alibi) claimed to have spent much time during the 1980 Memorial Day weekend. This evidence had significant tendency to show consciousness of guilt (see *Commonwealth* v. *Porter,* 384 Mass. 647, 652-656 [1981]) and was appropriately used by the prosecution to explain to the jury why Barbara Hickey (once granted immunity) changed earlier testimony before a Federal grand jury and told the truth at trial.