## COMMONWEALTH vs. DAVID P. VERMETTE.

No. 92-P-1060.

Bristol. March 10, 1997. -- November 13, 1997.

Present: PERRETTA, LAURENCE, & LENK, JJ.

*Error, Harmless. Constitutional Law,* Self-incrimination. *Evidence,* Prior misconduct, Cumulative evidence, Relevancy and materiality, State of mind. *Practice, Criminal,* Comment by prosecutor.

In a criminal case, the judge erred in allowing a police officer to testify that the defendant had refused to permit police to search his car and photograph his sneakers, but the error was harmless beyond a reasonable doubt where it was cumulative of the defendant's own testimony, where any adverse inferences could not, in the circumstances, have detracted from his defense, and where the prosecutor did not argue the refusals, nor did the judge mention the refusals in his instructions on consciousness of guilt. [797-799]

At a criminal trial, the judge did not abuse his discretion in admitting evidence of the defendant's prior bad act which was relevant and probative of the defendant's motive and intent with respect to the crime with which he was charged. [799-800]

At the trial of a criminal case, testimony concerning a deceased witness's statements that impeached the witnesses's confession to the crimes for which the defendant was being tried was properly admitted to show the intention of the declarant to lie in confessing the crime. [800-802]

The prosecutor at a criminal trial improperly asked the defendant if he had made a certain statement while awaiting trial, however reversal of the defendant's convictions was not warranted where the defendant had already informed the jury of his trial and acquittal in the case to which the prosecutor referred. [802]

Any impropriety in the prosecutor's closing argument at a murder trial was harmless in the context of the argument and in light of the judge's instructions to the jury. [802-803]

INDICTMENTS found and returned in the Superior Court Department on April 27, 1988.

The cases were tried before *James J. Nixon,* J.

*Iris Alkalay* for the defendant.

*David B. Mark,* Special Assistant District Attorney, for the Commonwealth.

PERRETTA, J. At the defendant's trial on indictments charging him with armed assault with intent to murder and assault and battery by means of a dangerous weapon, the jury were allowed to hear: (1) that the defendant had refused to allow the police, who were investigating the shooting of Shawn Cabral, to search his automobile and turn over his sneakers; (2) that two weeks prior to the shooting, the defendant had allegedly assaulted Cabral's sister with a knife; and (3) that a person who had confessed to the shooting of Cabral had stated to a Commonwealth witness that the defendant was going to pay him for the confession and assist him in fleeing the country. On appeal, the defendant argues that this evidence and various improper remarks by the prosecutor require the reversal of his convictions. We affirm.

1. *The evidence.*[1] Shawn Cabral testified that one day during the first week of March, 1988, he arrived at his Freetown home to find his sister, Lisa, crying and his mother very upset. After speaking with them, Cabral called his sister's boyfriend, the defendant. Cabral described how he argued with the defendant: he told him that he would get back at him for attacking Lisa with a knife and dragging her into the woods, and he warned him to stay away from her.

About two nights after that telephone conversation, Cabral left his house shortly after midnight to drive to work. As he drove around a bend in his driveway, a dirt road about two hundred feet long with swampy areas and trees along both sides, Cabral saw that tree branches were on the ground, blocking his ability to proceed out to the road. He got out of his car and moved the branches off to the side of the driveway.

On March 11, 1988, about 2:30 A.M., Cabral's driveway was again blocked by tree branches. When he got out of his car to remove them, he heard a gunshot. Cabral fell to the ground between the branches and his car. He had been shot in the left leg. He saw someone standing to his left, pointing a gun at him. The assailant was dressed in black and wore a ski mask, which covered his face. This person then shot Cabral in the right leg and, again, in the left leg. Cabral turned on his side and covered

---

[1]Because we conclude that any violation of the defendant's privilege against self-incrimination protected by art. 12 of the Declaration of Rights of the Massachusetts Constitution was harmless beyond a reasonable doubt, see *Commonwealth* v. *Hinckley*, 422 Mass. 261, 267 (1996), we recite the evidence in some detail.

his face with his arm. Another shot was fired, hitting the ground directly in front of (and causing powder burns on) Cabral's face. Cabral remained very still because he thought that he could hear his assailant walking near to him. After awhile, believing that the assailant had left the area, Cabral crawled to his car and drove back up his driveway while leaning on the horn. When his sister came to the door, he told her what had happened, and she called the police.

Upon receiving a radio dispatch at about 2:40 A.M., Michael Lecuyer of the Freetown police department went to Cabral's address. He had to remove tree branches from Cabral's driveway before he could reach the house. Farther up the driveway, he found Cabral wrapped in blankets. Cabral told Lecuyer what had happened and, after an ambulance arrived, Lecuyer notified his chief, Edward Mello, and Detective Alvan Alves and then went back down the driveway to search the area where he had earlier seen the branches. Lecuyer found puddles of blood, some small bullets, and footprints which he described as "sneaker-type" prints. State police officer Kenneth Martin made casts of the footprints and testified that, in his opinion, the prints could have been made by "Converse canvas-type sneakers." After also observing the area of the shooting, Alves went to the hospital and spoke with Cabral. He then went in search of the defendant.

Alves found the defendant that morning, March 11, at his sister's house in Marion. His friend Edward Carney was also there. The defendant told Alves that he and Carney had been at the sister's house since about 10:00 the night before. When Alves told the defendant "to try again," the defendant said that he had gone to a bar in New Bedford the night before until about 1 A.M. and that, upon leaving, he drove around New Bedford and then returned to his sister's house. Alves then told the defendant that he knew more than the defendant realized and that he wanted to know about his "trip to Freetown."

According to Alves, the defendant paled and became anxious. He told Alves that he had gone to Freetown to beat his former girlfriend's brother. Carney drove and dropped him off at Cabral's driveway. The defendant told Alves that he instructed Carney where to park and to wait until he, the defendant, had sufficient time to beat Cabral, and then he was to return for him. He also described how he used tree branches to barricade Cabral's driveway. The defendant told Alves that, when Cabral

came down the driveway and got out of his car to remove the branches, someone shot at him. Upon hearing the shots, the defendant fled to Carney's car and told him that someone was shooting at them. The defendant and Carney drove off, "ending up at his sister's house."

When Alves asked Carney and the defendant if they would accompany him to the Freetown police station where he could reduce their statements to writing, the defendant stated that he wished to speak with an attorney first. Alves then went outside and, with Carney's consent, examined the interior of his vehicle and "viewed" the defendant's locked vehicle. Alves could see a gym bag as well as a brown shopping bag in the back seat and that there was "black material," "black cloth" in the bag.

Alves asked the defendant if he could search his vehicle and informed him that he had the right to refuse. The defendant refused to allow the search. Alves next asked if he could photograph the bottom of the defendant's sneakers, and, again, the defendant refused.

When Alves began to make arrangements with Carney about going to the Freetown police station to give his statement, the defendant interrupted and told Carney that he should not speak to the police; rather, Carney should go with him and speak with his (the defendant's) attorney and that he would pay all his legal costs.

Carney left with the defendant, and Alves returned to Freetown. Upon his arrival at the police station, he had a message from an attorney in New Bedford. Alves returned the call and drove to the attorney's office. The attorney advised Alves that he represented the defendant and Carney. Alves interviewed the two men and was allowed to take the sneakers the defendant was wearing and which Alves described as being "Sports Built." The defendant also consented to a search of his automobile. Alves testified that although the gym bag was still in the car, the paper bag containing the "black material" was not.[2]

During cross-examination of Alves, the defendant elicited information showing that a Paul Gonsalves had written letters and made tape recordings in which he confessed to shooting

[2]The defendant's footwear was delivered to a chemist for the Department of Public Safety crime laboratory. The chemist described the footwear as size ten coach's shoes. The shoes were examined for blood and soil but neither was found.

Cabral. Over the prosecutor's objection, defense counsel introduced one of the letters in evidence.[3] The remaining letters and tapes were thereafter introduced by the prosecutor without objection from defense counsel.[4]

With the letters and tapes in evidence at the defendant's behest, the Commonwealth then called State trooper Michael Crisp. Crisp related that about six weeks (May 31, 1988) after the shooting of Cabral, he participated in an investigation concerning a body found on the beach in Mattapoisett. The deceased, Paul Gonsalves, had been shot to death with two revolvers, both of which had been left by his body. There was a trail of blood leading from his body to a marsh area. Following the trail into the marsh, the police came to an area in the marsh grass which had been matted down by a body. There they found a plastic bag containing white envelopes which were separately addressed to the Cabral residence, the Vermette family, the defendant's attorney, and the prosecutor. Each contained a letter that the parties stipulated was written by Gonsalves and a tape, the items earlier placed in evidence. A drug tote book, that is, a book recording drug sales, was found on Gonsalves's body.

We return to the evidence of the defendant's guilt. Testifying under a grant of immunity, Carney related how he drove the defendant close to Cabral's property on the early morning of March 11. The defendant had told Carney that he wanted to retrieve his dog from Cabral's sister but that stealth was necessary because he was not welcome at her house. While driving to Cabral's house, the defendant told Carney that he had had an argument with Cabral, that he would like to "beat him up," that he had been at Cabral's house "at another time" and had put bushes in front of his car, and that Cabral got out of his car with a baseball bat "like he was actually waiting for someone to attack him."

Carney told how he and the defendant drove past the Cabral driveway and proceeded to a parking lot at a boat landing. The

---

[3]The trial judge concluded that it was "fundamental" to allow a defendant to show that someone else committed the crime. See *Commonwealth* v. *Lawrence*, 404 Mass. 378, 387 (1989), quoting from *Commonwealth* v. *Keizer*, 377 Mass. 264, 267 (1979); *Commonwealth* v. *Harris*, 395 Mass. 296, 300 (1985).

[4]Indeed, defense counsel stated: "I'm willing to stipulate, he doesn't even have to move it." In any event, neither the Commonwealth nor the defendant, both having offered the letters and tapes for evidence at trial, make any argument on appeal concerning the admissibility of these items.

defendant put on a ski mask and gloves, telling Carney that no one was to know who he was. The defendant left the lot, and Carney fell asleep in the car. Because he had been sleeping, Carney lost track of the time. He was awakened when the defendant returned, got into the car, and told him "Let's get out of here, someone is trying to shoot at me." Carney sped off. When he reached a highway, the defendant began to throw his gloves and Converse sneakers out of the window. The defendant had with him a pair of "Sports Built coach-type shoes" which he did not throw away. Directing Carney to stop the car, the defendant stepped out onto a bridge and tossed the ski mask into the water. He told Carney several times that he was to forget ever having seen the ski mask and that he was never to say anything about it. The defendant directed Carney to his sister's house where they spent the night.

After Alves questioned them at his sister's house, the defendant asked Carney to accompany him to his attorney's office. Carney agreed. They drove to the lawyer's office in the defendant's car. During the ride, the defendant again told Carney "to forget about the mask and the gloves." After arriving at the lawyer's office and speaking with him, they were joined by Alves, to whom they also gave a statement.[5] Carney testified that, after giving their statements to Alves, they proceeded to the defendant's car, which was then searched by Alves. When the search was completed, Carney and the defendant returned to his sister's house.

A few days later, after reading a newspaper account about the attempt upon Cabral's life, Carney went to the defendant and asked him whether in fact he had told him everything that had happened on the early morning of March 11. The defendant again warned Carney that he was to forget about the mask and the gloves, that he was not to worry about what was happening, that Carney's lawyers would be paid for, and that Carney was to remain calm and "go with the flow."

Robert Jardin related that on March 5, 1988, the defendant telephoned him and asked whether he could get him a gun, which he intended to resell to a friend. When Jardin told him that he would not sell a gun to someone he did not know, the conversation ended. A few moments later, the defendant called

---

[5]During this interview, Carney did not tell Alves that the defendant was wearing Converse sneakers on March 11. Nor did he make any mention of a ski mask or gloves.

back and told Jardin that he had been joking and that the gun was actually for him. Jardin told the defendant that he would ask around. The defendant did not pursue the matter further with Jardin. However, according to Tyrone Cazwell, who testified under a grant of immunity, he was able to obtain a gun for the defendant.

Cazwell related that on March 9, 1988, he and Paul Gonsalves obtained a gun and then met the defendant who was waiting in his car about a block away. Gonsalves opened the door to the defendant's car and handed him the gun. The defendant stated that he would give the money to Gonsalves to give to Cazwell. About three weeks later, Cazwell, Gonsalves, and the defendant were driving in the defendant's car. At that time, the defendant told Cazwell that he would pay him $5,000 to "lie" to his lawyer. The defendant explained that there was a case against him but, because of a lack of witnesses, it was not a strong one. As related by Cazwell, the defendant reasoned that, with more witnesses, there was less of a chance the case would proceed to court. Because the defendant did not want his lawyer to know that he (Cazwell) was lying, he and Gonsalves coached Cazwell on what he was to tell the defendant's attorney.[6]

Acknowledging that the prosecution had agreed to seek favorable treatment for him on a probation surrender matter in exchange for his testimony, Eduardo Cores testified that he had been a friend of Gonsalves. He related that in late April or early May of 1988, Gonsalves told him that he intended to buy a car which he would pay for with money given to him by the defendant for speaking with his lawyer. Cores stated that in mid-May Gonsalves told him that he had spoken with the defendant's lawyer but that the defendant had yet to pay him

[6]"He wanted me to say that I was in Presidential Heights the night before the shooting in Freetown, and a man comes driving up on a motorcycle and tells me, Hey, kid, you want to make some money, and I say, Yeah, what do you want me to do? And he says, Well, I want you to rough up this guy, beat him up, and I say, Why can't you do it, you're a pretty big guy, and he says, Well, I'll pay you $300 and pulls out money and tells me, I'll pay you $300 to do this, so I'm supposed to say, Okay, let's go right now, but the guy says, No, not now, tonight, the guy goes to work at 2:30, meet me at Cumberland's at 2:00 tonight. So I say, Okay. I meet the guy up there. I see him. I say, What's up? He says, he pulls out a gun and says there's a change of plans. I'll give you more money if you shoot this guy's car. And then I was supposed to say, No, you never said nothing about any gun. I ain't dealing with none of that, and leave, and that was supposed to be it."

any money. On May 24, Gonsalves told Cores that he was going to get $400,000 for "taking the rap" for the shooting of Cabral. Gonsalves described to Cores how "he was going to make tapes and letters and fake his death," after which the defendant's father would fly him to the Bahamas. Gonsalves told Cores that "[h]e had to take a lie detector test before they give him the money to make sure he don't tell nobody." Gonsalves was to deliver the letters and tapes to the defendant's house on Memorial Day.

Testifying to his version of events, the defendant related that he first met Gonsalves in February, 1988. During a conversation in which the defendant mentioned Lisa Cabral's name, Gonsalves volunteered that Shawn Cabral owed him money for cocaine and that he intended to "beat up" Cabral if he did not get paid. The defendant stated that a week after that conversation with Gonsalves, Cabral called and threatened him. Cabral's threats prompted the defendant to tell Gonsalves, when he next saw him, that should he (Gonsalves) decide to confront Cabral, he would like to join him. A week later, Gonsalves informed the defendant that, if he wanted to participate in a beating of Cabral, he should be at Cabral's house on Thursday (March 11, 1988) at about 2:30 A.M.

According to the defendant, Carney dropped him off at the mouth of Cabral's driveway on the early morning of March 11 and then proceeded down the road to a parking lot at a boat ramp. The defendant stated that he did not have any gloves with him when he got out of Carney's car. As he walked down Cabral's driveway, he saw "shadows." He whispered the name "Paul" and Gonsalves responded "Yeah." Gonsalves and Cazwell were standing by some branches in the driveway. When the defendant saw that they had guns, he protested, saying that nothing had been said about guns and that he wanted no part of it. He attempted to leave but Cazwell told that him that he was now a part of it, that he was not going anywhere, and that he (Cazwell) would kill him. The defendant then saw Cabral's car approaching. When Cabral got out of the car, the defendant heard gunshots. He then ran back to the boat ramp and Carney's car.

Two weeks later, Gonsalves told the defendant that the police believed that he (the defendant) had shot Cabral. The defendant explained to Gonsalves that he had to tell the police that Gonsalves and Cazwell were at Cabral's on March 11. Gonsalves

responded that, if the defendant did not tell the police that he (Gonsalves) had a gun, he would go with the defendant to see his attorney. However, the defendant was not to tell Cazwell. Gonsalves told the defendant that, because he knew where Cazwell had thrown his gun, he could prove that Cazwell shot Cabral.

The defendant also testified that on April 10, while seated in his parked car, a masked gunman dressed in black approached and shot into the defendant's car, shattering the windows. Later that month, while standing outside his sister's apartment building, the defendant had a conversation with Gonsalves and Cazwell. When Gonsalves brought up the fact that the police were charging the defendant with the shooting of Cabral, Cazwell laughed. He told the defendant that it appeared that the defendant needed them more than they needed him. The defendant replied that they were wrong and that he would tell the police what had happened. When he told Cazwell that he would reveal to the police that he (Cazwell) had shot Cabral and that he knew where Cazwell had thrown the gun, Cazwell turned on Gonsalves. The defendant warned Gonsalves and Cazwell that his sister was watching and that, if anything happened to him, his lawyers knew everything and would go to the police.

Perhaps hoping to quell suspicion that the jury might be harboring that he was involved in Gonsalves's death, the defendant testified that a year earlier, January, 1989, he had been tried for and acquitted of Gonsalves's murder.

On cross-examination, the defendant acknowledged that in an earlier proceeding on the instant charges, he had testified that Gonsalves had told him that he had been hired to shoot Cabral, that not even Cazwell was aware of that fact, and that he had led Cazwell, as he had the defendant, to believe that he wanted to harm Cabral because he owed him money for drugs.

2. *Refusal evidence.* For the reasons discussed in *Commonwealth* v. *Hinckley*, 422 Mass. 261, 264-265 (1996), and the cases therein cited, we conclude that it was error to allow Alves to testify to the defendant's refusal to the search of his car and the photographing of his footwear. This conclusion requires us to consider whether the error was harmless beyond a reasonable doubt. *Id.* at 267. "Whether an error is harmless depends on many factors, *Delaware* v. *Van Arsdall*, 475 U.S. 673, 684 (1986), including whether the 'erroneously admitted evidence

was "merely cumulative" of evidence properly before the jury.' *Commonwealth* v. *Sinnott*, 399 Mass. 863, 872 n.8 (1987). The essential question is whether the error had, or might have had, an effect on the jury and whether the error contributed to or might have contributed to the verdicts. See *Commonwealth* v. *Marini*, 375 Mass. 510, 520 (1978)." *Commonwealth* v. *Perrot*, 407 Mass. 539, 549 (1990).

We think the refusal evidence was cumulative of the testimony of Carney and the defendant himself. The adverse inference available from the defendant's refusal to allow a search of his car is that he had removed or destroyed the clothing in the brown bag between the time of his refusal and his subsequent consent. The inference available from the defendant's refusal to allow his footwear to be photographed is that he feared that the soles would match any footprints left in the area of the shooting. The defendant, however, told Alves that he was at Cabral's driveway on March 11, and he told the jury that he was with Gonsalves and Cazwell that early morning but fled when they shot Cabral. Carney described in detail what the defendant had been wearing at the time of the shooting and related how he had thrown his gloves and Converse sneakers out the window and thrown the ski mask into the river.

Any adverse inferences to be drawn from the defendant's refusals could not have detracted from his defense at trial, that is, he was at the driveway with Gonsalves and Cazwell but only for purposes of participating in a beating of Cabral and he had nothing to do with the shooting of him. The adverse inferences to be drawn from his refusals to allow the police to search and obtain evidence of his clothing and matching footprints support that which the defendant readily admitted, his presence. Any adverse inferences that might have been drawn by the jury were irrelevant to the question of whether he acted alone or with Gonsalves and Cazwell. Resolution of that issue depended entirely upon the credibility of the defendant, Carney, Jardin, Cazwell, and Cores.

Additionally, the prosecutor made no mention of the defendant's refusals in his closing argument, and the trial judge made no specific mention of the refusal evidence in his instructions on consciousness of guilt, which were warranted on the basis of evidence of the defendant's conduct separate and apart

from the refusal evidence.[7] Contrast *Commonwealth* v. *Hinckley*, 422 Mass. at 263-264.

In view of these circumstances, we conclude that the error in admitting evidence of the defendant's refusals to allow the search of his automobile and the photographing of his footwear was harmless beyond a reasonable doubt.

3. *Prior bad act.* There was discussion at a pretrial conference concerning the question whether the Commonwealth could introduce the details of an argument between Cabral and the defendant in which Cabral accused the defendant of assaulting his sister, Lisa, with a knife. At the conclusion of the conference, the trial judge ruled that the Commonwealth could show that there had been an argument between the two men during which Cabral threatened the defendant but that the Commonwealth should not offer all the details of that argument.

When, at trial, Cabral testified to that argument with the defendant and related how he accused him of dragging his sister at the point of a knife into the woods, the defendant sought a mistrial. Although the trial judge agreed that Cabral's testimony "may have gone beyond the spirit" of the pretrial conference, he denied the motion on the basis that he did not find the testimony "devastating or harmful to the defendant."

"Evidence that is otherwise relevant to the offense charged is not rendered inadmissible simply because it tends to prove the commission of other crimes." *Commonwealth* v. *Jackson*, 384 Mass. 572, 577 (1981). Rather, "[s]uch evidence, if relevant, may be admitted . . . if it is offered for a purpose other than impugning the defendant's character, and if its probative value is not substantially outweighed by any prejudice." *Commonwealth* v. *Otsuki*, 411 Mass. 218, 236 (1991).

---

[7]The trial judge instructed:

"One of the ways in which you may consider a question of consciousness of guilt in this case is if you find there has been intentionally made certain false statements about the acts that were — by the defendant — about the act which constitute a commission of these crimes. Also, any intent, if you should find it, to conceal, destroy or falsify evidence. Also, you might consider if there had been any attempt to intimidate or coerce or bribe a witness whom he thought and believed would testify against him. If you decide such inferences are reasonable, it would be up to you to decide how much importance to give them, but you should always remember that there may be numerous reasons why an innocent person might give conflicting reports."

We see no abuse of discretion in the trial judge's ruling. The evidence was admissible to show why Cabral threatened the defendant and that the defendant would have a motive to make the first move, that is, hurt Cabral before Cabral hurt him. Moreover, the defendant testified that when Lisa's name came up in his conversation with Gonsalves, he told Gonsalves that he wished to participate in an attack upon Cabral. See *Commonwealth* v. *Clemente*, 25 Mass. App. Ct. 229, 239-240 & n.15 (1988) (trial judge did not abuse his discretion in admitting evidence of the defendant's involvement in prior criminal activity which was "inextricably tied" to the crime in issue).

4. *Gonsalves's state of mind.* When the Commonwealth sought Cores's testimony to refute the credibility of the statements made by Gonsalves in his letters and tapes, the defendant objected. Although the trial judge concluded that Cores's testimony concerning Gonsalves's statements to him was admissible, it is not entirely clear from the transcript whether that conclusion was based upon the state-of-mind exception to the hearsay rule, as argued to him by the Commonwealth, or a determination that Gonsalves's statements to Cores were admissible as prior statements inconsistent with those made in the letters and tapes.

Discussing the two possible bases of admissibility in somewhat overlapping and interchangeable terms, the trial judge concluded that Cores's testimony was relevant to the question of whether the jury should believe Gonsalves's confession which was put in issue by the defendant. On appeal, the defendant argues only that, because the Commonwealth failed to show that Gonsalves's state of mind was made known to the defendant, Cores's testimony was inadmissible under the state-of-mind exception to the hearsay rule. See *Commonwealth* v. *Borodine*, 371 Mass. 1, 8 (1976), cert. denied, 429 U.S. 1049 (1977); *Commonwealth* v. *Olszewski*, 401 Mass. 749, 758-759 (1988). The Commonwealth's sole response to this argument is that Gonsalves's statements to Cores were admissible to impeach the subsequent statements he made in his letters and tapes. See *Commonwealth* v. *Simmonds*, 386 Mass. 234, 242-243 (1982); *Commonwealth* v. *Gil*, 393 Mass. 204, 220 (1984). See also Proposed Mass.R.Evid. 806, which rule "seems essentially consistent with common practice." Liacos, Mas-

sachusetts Evidence § 8.4.3 (6th ed. 1994), and which is identical to Fed.R.Evid. 806.[8]

Although Cores's testimony was admissible to impeach Gonsalves's confession, no instruction limiting that evidence to impeachment purposes was given the jury. While correctly pointing out that defense counsel made no request for such an instruction, *Gil, supra*, the Commonwealth overlooks the fact that the evidence was offered and arguably allowed by the trial judge on the basis of the state-of-mind exception to the hearsay rule. In these circumstances, we choose also to consider whether the statements were admissible on the basis presented to the trial judge. Cf. *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 102 (1997).

Turning to the defendant's argument, that the statements were inadmissible under the state-of-mind exception to the hearsay rule in the absence of evidence showing that the defendant knew of Gonsalves's state of mind, we think the defendant's reliance upon *Borodine* and *Olszewski* is misplaced. Those cases involve the admissibility of statements offered on the issue of motive. If a declarant's state of mind is claimed to have been a motivating force upon a defendant, it stands to reason that it must also be shown that the defendant knew of that state of mind. See *Commonwealth* v. *Qualls*, 425 Mass. 163, 167-170 (1997). In the present case, Gonsalves's statements were not offered to show any motive on the part of the defendant. Rather, the Commonwealth offered Gonsalves's statements to Cores to show that he, Gonsalves, intended to lie and confess to shooting Cabral, a showing from which the jury could infer that his subsequent statements, the letters and the tapes, were the doing of the intended act, viz., lying. As such, they were properly

---

[8]As pertinent, rule 806 provides:

"When a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with his hearsay statement, is not subject to any requirement that he may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine him on the statement as if under cross-examination."

admitted. See *Mutual Life Ins. Co.* v. *Hillmon,* 145 U.S. 285, 295-296 (1892) (statements that show an intention of the declarant are admissible, if not remote in time, to prove that intention was carried out by the declarant). See also *Commonwealth* v. *Trefethen,* 157 Mass. 180, 185-186 (1892) (error to exclude declarant's statement of intention to drown herself where her body was subsequently found in river); *Commonwealth* v. *Ferreira,* 381 Mass. 306, 311-312 (1980) (error, albeit harmless in circumstances, to limit evidence of state of mind to impeachment where declarant of statement of intent to shoot a police officer was only other possible perpetrator of the murder). Compare *Commonwealth* v. *Stewart,* 411 Mass. 345, 355 (1991) (no error in excluding the defendant's statement of intention to meet mother for lunch, thereby explaining his presence at scene of murder, where evidence offered merely to prove his intention to meet rather than to prove the meeting). See generally 2 McCormack, Evidence § 275 (4th ed. 1992); Liacos, Massachusetts Evidence § 8.15.

5. *Prosecutorial improprieties.* There can be no doubt that the prosecutor should not have asked the defendant whether the first time he told anyone the facts as testified to by him on direct examination was in January, 1989, "while you were held awaiting trial." The statement does not, however, merit reversal of the defendant's convictions in view of the facts that the jury had been informed by the defendant about his January, 1989, trial and acquittal of Gonsalves's murder and that, although defense counsel requested a mistrial, he declined a curative instruction. Nor should the prosecutor have stated in his closing argument, "[W]ho asked to go to side bar more times and who made more objections?" See *Commonwealth* v. *Burke,* 373 Mass. 569, 575 (1977). Although the prosecutor was entitled to respond to the accusations made by defense counsel in his closing argument that the Commonwealth had "slanted, shaded and suppressed evidence," had engaged in deception, and had fought to keep evidence from the jury then "flip-flopp[ed]" on using Cabral's medical records and Gonsalves's confession, he should not have made comparative mention about defense counsel's objections. However, in view of the fact that the prosecutor made the retaliatory reply in the context of directing the jury's attention to those exhibits about which defense counsel had accused him of "flip-flopping" and in light of the instructions given by the trial judge immediately before the arguments and

during his charge, we conclude that the error was harmless. See *Commonwealth* v. *Rogers, ante* 782, 786-787 (1997). The defendant's remaining complaints about the prosecutor's closing argument warrant no discussion.

*Judgments affirmed.*