## Commonwealth *vs.* Eugene Murphy.

No. 01-P-499.

Middlesex. September 17, 2002. - March 19, 2003.

Present: Cypher, McHugh, & Kafker, JJ.

*Practice, Criminal,* Cross-examination by prosecutor, Question by jury. *Witness,* Cross-examination, Child, Competency. *Jury and Jurors.*

At a criminal trial, the prosecutor's degrading question while cross-examining the defendant was improper, but the question did not create a substantial risk of a miscarriage of justice requiring reversal of the defendant's conviction, where the question was an aberrant departure from an otherwise properly conducted cross-examination, where the prosecutor did not dwell on the subject raised by the improper question and did not seek in her summation to have the jury draw any inferences from the defendant's answer to that question, and where the evidence of the defendant's guilt was strong. [588-591]

At a criminal trial in which a child was a witness, the judge did not err in determining that the child was competent to testify and in allowing the child to testify without taking an oath, where the voir dire that the judge conducted of the child before he was seated on the witness stand explored all of the required elements of competency, and where the pretestimonial exchange between the judge and the child demonstrated, adequately and with due solemnity, that the witness was prepared to tell the truth and the whole truth. [591-592]

The judge at a criminal trial properly responded to a question that the jury asked during the course of their deliberations. [592-594]

Indictment found and returned in the Superior Court Department on October 22, 1998.

The case was tried before *Raymond J. Brassard,* J., and a motion for a new trial was heard by him.

*James M. McDonough* for the defendant.

*Jessica Langsam,* Assistant District Attorney, for the Commonwealth.

McHugh, J. Following his conviction of rape of a child under the age of sixteen, G. L. c. 265, § 23, the defendant filed this

appeal. He claims that the prosecutor asked an impermissible question on cross-examination; that the trial judge committed prejudicial error in his determination of the victim's competency and in allowing the victim to testify without taking an oath; and that the judge mishandled a question the jury asked during its deliberations. He also appeals from the denial of his motion for a new trial. We affirm.[1]

Facts material to each of the alleged errors will emerge as we discuss the individual claims. By way of background, however, the defendant and the victim's mother lived together for approximately two and one-half years and were engaged to be married. Although the defendant and the victim, age seven at the time of trial, were unrelated, the victim called the defendant "Daddy," and the defendant treated him as if he were his son.

On Saturday nights, it was customary for the defendant to put the victim to bed. The bedtime ritual consisted of talking, story-reading and "goofing around." According to the victim, the ritual often ended with the defendant sucking on the victim's penis. On one Saturday evening, the victim's mother encountered the defendant and the victim in the victim's bedroom behaving in what she viewed as a suspicious manner. She asked the defendant to leave the bedroom and, the following day, learned from her son the malignant details of the defendant's

[1]The defendant also asserts that it was error for the judge to permit the jury to look at a videotape that was not in evidence. There is nothing to that claim. The tape in question recorded a pretrial interview between the victim and an investigator. It had been shown to the jury, at the defendant's request and over the Commonwealth's objection, during the course of the trial. The judge gave careful limiting instructions at the time the tape was shown. The videotape was then marked for identification. During their deliberations, the jurors asked to see the tape again. Again over the Commonwealth's objection, the judge permitted them to do so in the courtroom, in his presence, and in the presence of the defendant and both counsel. Again, the judge gave forceful contemporaneous limiting instructions. Assuming that any claim of error survives the currently unchallenged tactical decision to let the jury view the tape, see, e.g., *Commonwealth* v. *Laurore*, 437 Mass. 65, 80 (2002), a trial judge has discretion to permit deliberating jurors to listen to portions of testimony that were introduced during the course of the trial. *Commonwealth* v. *Mandeville*, 386 Mass. 393, 405 (1982). The fact that the videotape itself was not in evidence is of no consequence. The tape, like a transcript, was simply a record of what had been introduced during the trial. The evidence was the tape's content, not the tape itself.

activity. She promptly informed the police. An investigation, the indictment, and the trial promptly ensued.

The defendant's first claim of error centers on a question the prosecutor asked the defendant at the close of cross-examination. From the trial's opening moments, the theme of the defense had been that the alleged incidents never happened and that the victim was projecting onto the defendant activities in which the victim had been engaging with the nine year old girl who lived next door. That defense first appeared in a statement the defendant made to police before he was arrested. It reemerged in defense counsel's opening statement at the trial, in defense counsel's cross-examination of the Commonwealth's three witnesses, and in the defendant's direct testimony. That defense never wavered.

The prosecutor began her cross-examination of the defendant by exploring his relationship with the victim and with the victim's mother. She then moved to discrepancies between the defendant's trial testimony and the statement he had given police during the course of their investigation, discrepancies of detail, not of theme. She next explored briefly the defendant's relationship with his brother and then focused, with equal brevity, on the storytelling in which the defendant claimed he had engaged on the evening the victim's mother asked him to leave the victim's bedroom. Then came this:

> PROSECUTOR: "And on that Saturday night the two of you were acting silly?"
>
> DEFENDANT: "No, I wasn't. He was, though."
>
> . . .
>
> PROSECUTOR: "Telling stories to each other?"
>
> DEFENDANT: "Yes."
>
> PROSECUTOR: "[The mother] came in once?"
>
> DEFENDANT: "Yes."
>
> PROSECUTOR: "[The mother] called out once?"
>
> DEFENDANT: "Yes."

PROSECUTOR: "How did it feel when you were sucking your son's penis?"

DEFENDANT: "That didn't happen."

PROSECUTOR: "That didn't happen?"

DEFENDANT: "And it's pretty vulgar of you to say that."

That closing exchange ended the prosecutor's cross-examination. The defendant claims that, although the exchange occurred without objection, the prosecutor's question was improper and created a substantial risk of a miscarriage of justice.

There are many ways to characterize the prosecutor's question, none positive. Technically, the question was multifarious and assumed a fact — that the victim was the defendant's son — contradicted by all of the evidence in the case. The question was of marginal relevance, for how the defendant "felt" had no bearing on his guilt or innocence. Most important, though, the question was one that, given all that had gone before, no reasonable prosecutor could have expected to produce an answer helpful to the Commonwealth's case. Instead, reasonably viewed, the question could do nothing more than degrade.[2]

Few cases in Massachusetts, or elsewhere, have dealt with the propriety of inflammatory or degrading questions asked on cross-examination. The dearth of cases on the subject no doubt reflects the harsh environment in which criminal cases breed and with which effective cross-examination must contend. Nevertheless, the need for hardy cross-examination "is not without limits, and it 'must be accommodated to other legitimate interests.' " *Commonwealth* v. *Johnson*, 431 Mass. 535, 540 (2000), quoting from *Commonwealth* v. *Clifford*, 374 Mass. 293, 305 (1978). Trials are a search for truth, not socialized stonings. Consequently, witnesses must not be subjected to "questions [that] go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate." *Ibid.*, quoting from *Alford* v. *United States*, 282 U.S. 687, 694 (1931).

---

[2]Although it argues that the question was not improper, the Commonwealth offers no explanation of the manner in which the question was likely to add something of value to its case.

To be sure, the fact that a question may be degrading is not, by itself, a barrier to its utterance. If the examiner reasonably believes that the answer will shed light on the credibility of the witness, or that the answer will aid the jury's exploration of a material fact, then a question's degrading content is simply a factor the trial judge must consider in determining whether the anticipated answer's probative value is substantially outweighed by any unfair prejudice the question will likely produce. See Proposed Mass.R.Evid. 402. On the other hand, when, as here, it is "extremely unlikely" that the prosecutor reasonably believed a helpful answer would be forthcoming, see *Commonwealth* v. *Fordham*, 417 Mass. 10, 21 (1994), or when the question's likely impact is simply to inflame or degrade, then the question goes "beyond the bounds of proper cross-examination," *Commonwealth* v. *Johnson*, *supra* at 540, and should not be asked. See *Commonwealth* v. *Smith*, 387 Mass. 900, 905 (1983). See generally Mass.R.Prof.C. 4.4, 425 Mass. 1405 (1998); Regan, Criminal Trial Practice, Ethical Lawyering in Massachusetts § 22.10.1 (rev. ed. 2000 & Supp. 2002) ("It is improper to ask a question without a reasonable belief that it is relevant or to ask questions intended solely to degrade a witness").

Impropriety of the question thus established, the issue becomes whether the question created a "substantial risk of a miscarriage of justice" and requires reversal of the conviction. See *Commonwealth* v. *Fordham*, *supra* at 20. Put another way, the issue is whether the question was "incompatible with the concept of a fair trial because of the likelihood that [the question would] 'sweep jurors beyond a fair and calm consideration of the evidence.' " *Commonwealth* v. *Mahdi*, 388 Mass. 679, 693 (1983), quoting from *Commonwealth* v. *Perry*, 254 Mass. 520, 531 (1926). Our review of the entire record persuades us that the question created no such risk. The question was an aberrant departure from an otherwise properly conducted cross-examination. Indeed, it was an aberrant departure from an otherwise properly conducted trial. The prosecutor did not dwell on the subject of the defendant's "feelings," and did not seek in her summation to have the jury draw any inferences from the defendant's assertion that the activity the question assumed had

not in fact occurred. In a way, the defendant deflected the question by turning it back on the prosecutor. The victim testified at some length, through a forceful cross-examination, about the nature and frequency of the sexual contact between himself and the defendant. His description of events was supported by testimony of a prompt fresh complaint, and his mother presented corroborating circumstantial evidence. In sum, the evidence, although by no means overwhelming, was strong, and the question appears to have come and gone without fanfare. While plainly improper, the question did not create a substantial risk of a miscarriage of justice.

The defendant's two remaining claims of error require less discussion. First, the defendant asserts that the judge erred in his determination that the victim was competent to testify and in allowing the victim to testify without taking an oath. We disagree.

The victim was seven years of age at the time of the events at issue and eight when he testified. Before his testimony, the judge permitted both sides to ask voir dire questions designed to explore his competency. The victim's answers revealed his ability to recall and relate. They also showed his understanding of the difference between truth and falsehood, of the importance of telling the truth, and of the fact that lies are frequently attended by punishment. At the end, the judge found that the victim was competent and neither side objected.

Before the victim was seated on the witness stand, the judge asked him the following questions and the victim gave the following answers:

> THE COURT: "Do you promise to tell the truth as to all the questions that are going to be asked of you?"
>
> THE WITNESS: "Yes."
>
> THE COURT: "Will you tell the entire truth, the whole truth?"
>
> THE WITNESS: "Yes."

THE COURT: "All right, thank you. You may be seated, please."[3]

The voir dire provided an entirely adequate basis for the judge to conclude that the victim was competent, for it explored all of the elements of competence decided cases have outlined. See *Commonwealth* v. *Welcome*, 348 Mass. 68, 70 (1964); *Commonwealth* v. *Brusgulis*, 398 Mass. 325, 330 (1986); *Commonwealth* v. *Monzon*, 51 Mass. App. Ct. 245, 248, 253 (2001). The pretestimonial exchange between the judge and the victim demonstrated, adequately and with due solemnity, that the victim was prepared to tell the truth and the whole truth. Missing were a reference to a deity and to "swearing" or "affirming." Although both are traditional,[4] neither is today essential. See, e.g., *Commonwealth* v. *Healey*, 8 Mass. App. Ct. 938, 938 (1979); *Commonwealth* v. *McCaffrey*, 36 Mass. App. Ct. 583, 589-590 (1994). See also G. L. c. 233, §§ 17-19; *Adoption of Fran*, 54 Mass. App. Ct. 455, 467 n.17 (2002); Liacos, Brodin & Avery, Massachusetts Evidence § 6.3, at 263 (7th ed. 1999).[5]

The defendant's final claim of error is based on the judge's

---

[3]The record does not show whether the victim had his right hand raised when he engaged in that dialogue with the judge. See G. L. c. 233, § 15. While customary, an upraised hand is not essential. See G. L. c. 233, § 16; *Commonwealth* v. *Smith*, 11 Allen 243, 251-252 (1865).

[4]The use of a "witness oath" originates in Germanic law and custom which "appeal[ed] to the supernatural . . . in the administration of justice." 6 Wigmore, Evidence § 1815, at 380 (Chadbourn rev. ed. 1976). The practice of administering oaths evolved into "a method of reminding the witness strongly of the divine punishment somewhere in store for false swearing" and, as such, was intended to prevent perjury. Wigmore, *supra* § 1816, at 382. Although no longer found in statutes, the current oath customarily given to witnesses in Massachusetts derives from an oath codified in the 1647 edition of "The Book of the General Lauues and Libertyes Concerning the Inhabitants of the Massachusets," which is "generally acclaimed as the first codification of laws since the time of Justinian." 1 Cushing, The Laws and Liberties of Massachusetts 1641-1691 xxi (1976). In a section entitled "Presidents and Forms of things frequently used," the witness oath appears in the following form: "You swear by the Living God, that the evidence you shall give to this Court, concerning the cause now in question, shall be the truth, the whole truth, and nothing but the truth. So help you God." Cushing, *supra* at 64. Slightly reformatted, that is the oath generally in use today.

[5]That is not to say that the traditional elements can or should be jettisoned without *good* reason or simply because a judge prefers a different approach. In use for centuries, those elements are by now a familiar part of a ceremony

response to a question the jurors asked during the course of their deliberations. That claim has its foundation in an event that occurred while the defendant was on the witness stand. During the trial, the judge allowed the jurors to question witnesses in accordance with the procedures outlined in *Commonwealth* v. *Urena*, 417 Mass. 692, 701-703 (1994). After the lawyers had finished their direct and cross-examination of the defendant, jurors sought to have the judge ask the defendant two questions. The first was whether the defendant "had any history of or [had] been the victim of physical or sexual abuse," and the second was whether the defendant had any knowledge of the victim's mother's "physical or sexual abuse history." The defendant objected to the first question, and both sides objected to the second. The judge posed neither question to the defendant.

After the evidence ended and deliberations began, the jurors sent the judge a question asking if "prior charges and/or records [are] admissible in a court case." With the assent of both parties, the court answered the question as follows: "The jury is to concern itself only with the evidence that was presented."

The defendant contends that the deliberating jury's question must be viewed in the context of the two questions the jurors posed earlier and that the judge therefore was required to answer by saying something to the effect that "criminal records would be admissible, if any existed, to impeach the defendant's testimony." That answer, in the defendant's view, would negate any jury suspicion that the defendant had some prior record of sexual misbehavior.

There is, however, no necessary connection between the questions posed by the jurors at trial and the question asked by the deliberating jury. A trial judge risks much mischief by going beyond the facial content of a deliberating jury's question in an effort to provide assistance on a subject that he or she infers is "really" troubling them. Moreover, even if there was a connec-

designed to remind witnesses and observers alike that testimony is a solemn process with serious consequences. The traditional elements, therefore, should remain a part of that ceremony unless, in a particular case, there is good reason to believe that a different formulation of the oath is more likely to achieve the ceremonial purposes.

tion between the earlier and the later questions, the answer the defendant now proffers would have been wholly incomplete. See, e.g., *Commonwealth* v. *Chase*, 372 Mass. 736, 750 (1977); *Commonwealth* v. *Drumgold*, 423 Mass. 230, 249-250 (1996). Finally, jurors are presumed to follow the court's instructions. See *Commonwealth* v. *Gentile*, 437 Mass. 569, 580 (2002); *Commonwealth* v. *Daley*, 55 Mass. App. Ct. 88, 97, further appellate review granted, 437 Mass. 1106 (2002). There was no evidence of "prior charges and/or records." Accordingly, the judge's answer effectively and forcefully told the jury not to concern themselves with what might have been and instead to base their verdict on what was. His answer not only failed to create a substantial risk of a miscarriage of justice, it failed to create any error at all.[6]

*Judgment affirmed.*

---

[6]On a related note, the defendant claims that the trial judge erred in denying his motion for permission to question the jurors on the subject of "bias" after the verdict was returned and also erred in denying his motion for a new trial without permitting the juror interrogation the first motion was designed to produce. As evidence of juror bias, he points to the three questions just discussed. Although a "postverdict inquiry may be appropriate where there is evidence of bias in order to ensure that the defendant received a fair trial," *Commonwealth* v. *Guisti*, 434 Mass. 245, 253 (2001), the jurors' questions simply disclose a desire for information. They raise no suggestion, much less evidence, that any juror or group of jurors was biased. There was no error in denial of the motions.