NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-705                                        Appeals Court


COMMONWEALTH  vs.  CHRISTOPHER CONLEY.


No. 22-P-705.

Hampshire.     July 6, 2023. - October 25, 2023.

Present:  Sacks, Shin, & Grant, JJ.


Attempt.  Homicide.  Assault and Battery by Means of a Dangerous
    Weapon.  Assault and Battery.  Evidence, Expert opinion,
    Prior misconduct, Motive, Intent, Admissions and
    confessions, Court record, Prior consistent statement,
    Cross-examination.  Practice, Criminal, Assistance of
    Counsel, Admissions and confessions, Continuance, Failure
    to object, Argument by prosecutor.  Witness, Expert.



    Indictments found and returned in the Superior Court
Department on August 11, 2015.

    The cases were tried before Richard J. Carey, J., and a
motion for a new trial, filed on November 30, 2021, was heard by
him.


    MarySita Miles for the defendant.
    Bethany C. Lynch, Assistant District Attorney, for the
Commonwealth.


    SACKS, J.  In 2015, the defendant confessed to having tried

to kill his seven year old daughter, who had complex medical

problems, by putting "Liquid Plumr" drain cleaner into a tube surgically connected to her large intestine. The defendant was indicted in 2015 for attempted murder (G. L. c. 265, § 16), assault and battery by means of a dangerous weapon on a child (G. L. c. 265, § 15A [c] [iv]), and assault and battery on a child causing substantial bodily injury (G. L. c. 265, § 13J). Despite recanting his confession at his 2020 Superior Court jury trial, he was convicted on all charges.

The defendant now appeals, arguing principally that the trial judge abused his discretion in (1) excluding the testimony of the defendant's expert on false confessions; (2) admitting evidence that, in the defendant's 2015 confession, he also acknowledged intentionally causing his daughter's blood infections in 2009 by dipping part of her central line in stool; and (3) excluding evidence that, shortly before the 2015 confession, the defendant told his attorney in a related care and protection case brought by the Department of Children and Families (DCF) that he "didn't do it" but was going to confess because "this is what we do for our family." The defendant also appeals from the judge's order denying his motion for a new trial based on ineffective assistance of counsel. We affirm.

Background.  The jury heard evidence that the defendant's daughter, M.C.,[1] had complex medical conditions that, among other things, interfered with her feeding normally.  As of 2009, M.C. had a total parenteral nutrition (TPN) central line inserted through her chest.  In March of 2009, when she was seventeen months old, she was admitted to the intensive care unit at Tufts Medical Center and treated by Dr. H. Cody Meissner for unusual blood infections related to the TPN line.

Dr. Meissner believed that the infections were caused by several types of bacteria found in M.C.'s bloodstream that were ordinarily found in the gastrointestinal tract -- a separate, contained system -- and in stool.  His "strong suspicion was that the tip of [M.C.'s] catheter was being placed in stool"; he could not think of any other medical explanation.  He was "very worried that something was going on with this family," and, indeed, the "infections stopped when [M.C.] was separated from the family."  Based on suspicions that someone was tampering with M.C.'s TPN line, DCF became involved and filed its first petition for the care and protection of M.C.  She was removed

---

[1] See Care & Protection of M.C., 479 Mass. 246, 250 & n.1 (2018), S.C., 483 Mass. 444 (2019).

from the custody of the defendant and his wife[2] (M.C.'s mother) for eighteen months but was ultimately returned to them.

By late 2014, when M.C. was seven years old, Dr. Doruk Ozgediz, a pediatric surgeon at Yale New Haven Hospital (YNHH), had implanted a cecostomy tube (C-tube) directly into her digestive tract.  The C-tube provided access to M.C.'s cecum (the upper part of her large intestine) so that it could be irrigated regularly with saline solution to relieve her severe constipation.

On the morning of April 15, 2015, the defendant stayed home with M.C. while the defendant's wife went to a school meeting from 8 A.M. to 9 A.M.  School records later confirmed her attendance at the meeting, and employment records later confirmed that the defendant arrived at work at 9:30 A.M. that day, which was later than usual, and then left again at noon.

That afternoon, the defendant and his wife brought M.C. to YNHH with a high fever.  M.C. was readmitted and seen by Dr. Ozgediz for a fever with rigors (shaking of the body) and abdominal distension causing mild discomfort; her vital signs were relatively normal.  Her condition remained similar until April 17, when she became critically ill, with signs of

---

[2] Sometime between his 2015 confession and his 2020 trial, the defendant and his wife apparently divorced.  For convenience we refer to her as "wife" throughout.

perforation of her intestines. Dr. Ozgediz performed surgery on M.C. and discovered that segments of her intestines "had essentially liquified and melted and had holes in them and were leaking fluid." He found that the portions of M.C.'s intestines immediately adjacent to the C-tube, including the cecum itself, were "essentially . . . dead"; two-thirds of her intestinal tract had to be removed. Her life was in danger. Dr. Ozgediz found no sign of any blood supply problem, infection, or tissue adhesion that could have caused the intestines to die, nor did the pathology results from the tissue and fluid show any clear cause.

M.C. initially recovered well from her surgery, but a week and a half later, fluid began to leak into her abdominal cavity. Further tests revealed that the fluid was urine, coming from a substantial hole in her bladder -- a condition that Dr. Ozgediz had never seen before. M.C.'s bladder necrosis was unusual, extending to a third or more of her bladder, with a clear line between the necrotic tissue and the healthy tissue. This, and the lack of any medical explanation for the damage to the intestines or bladder, led Dr. Ozgediz to conclude that he was "a hundred percent certain" that the cause was a "chemical injury." He further concluded that a caustic substance had been introduced through the C-tube into the intestines. It had

burned its way out of the intestines into the abdominal cavity, and from there into the bladder, over the course of a few days.

Shortly thereafter, on May 6, 2015, Dr. Ozgediz and others from the YNHH care team met with DCF, police, and a prosecutor to discuss their suspicions that the defendant and his wife had deliberately caused M.C.'s injuries. DCF then filed a second care and protection petition and informed the defendant and his wife that it was taking custody of M.C. That same day, a search warrant was executed on their home seeking items including a caustic substance such as drain cleaner; police found prescription opioids, saline solution, and sixty cubic centimeter (60 cc) plungers, but no drain cleaner.

Two days later, on May 8, 2015, the defendant met with the attorney appointed to represent him in the care and protection case. Although, as explained infra, the jury heard no evidence of it, the defendant told the attorney, "I am going to give the [d]istrict [a]ttorney a confession. I didn't do it. But this is what we do for our family."[3]

On May 20, 2015, the defendant, at his own request, met with a State police trooper working with the district attorney's

_____

[3] More than three years later, and assertedly with the defendant's permission, the attorney submitted to a recorded interview with police in which she related the defendant's statement and said that she had taken careful notes of the conversation.

office. In a recorded interview played at trial, the defendant told the trooper that on the morning of April 15, while his wife was at the school meeting, he used a 60 cc plunger to inject M.C.'s C-tube with Liquid Plumr, saline solution, and extra pain medicine. His goal was "to kill her" in order to "put her out of her misery." Pressed on whether his wife was also involved, he insisted that she was not. The defendant further stated that when M.C. was hospitalized at Tufts Medical Center in 2009, he had tried to "end it for her" in the course of a diaper change by dipping part of her TPN line in her stool and then reconnecting it.

At his 2020 trial, however, the defendant testified that this confession was false and that he had confessed only so "that [DCF] would focus on [him] and the DCF would back off of [his] wife and that [his] daughter could go back to her mom. And that way, [M.C.] would grow up with . . . one parent rather than none." The defendant also introduced expert evidence that 60 cc of Liquid Plumr could have produced a reaction for only fifteen minutes, a much shorter time than what Dr. Ozgediz posited. Further, two pathologists testified that M.C.'s injuries were caused not by a caustic agent but by loss of blood circulation to portions of her intestines and bladder.

Discussion. 1. Expert testimony on false confessions. The defendant first argues that the judge abused his discretion

in allowing the Commonwealth's motion to exclude the testimony of Alan Hirsch, an attorney and professor at Williams College, who would have testified about the existence of false confessions and the factors that would lead someone to make a false confession. The defendant asserts that the judge too strictly applied the Daubert-Lanigan[4] factors to the social science behind Hirsch's testimony.

The Daubert-Lanigan standard requires that expert testimony "rest[] on a reliable foundation" and be "relevant to the task at hand" (quotation omitted). Commonwealth v. Hinds, 487 Mass. 212, 217-218 (2021). The factors bearing on reliability are "whether the scientific theory or process (1) has been generally accepted in the relevant scientific community; (2) has been, or can be, subjected to testing; (3) has been subjected to peer review and publication; (4) has an unacceptably high known or potential rate of error; and (5) is governed by recognized standards." Commonwealth v. Powell, 450 Mass. 229, 238 (2007). See Hinds, supra at 221. But "[n]ot all of the factors . . . will be applicable in every case" (quotation and citation omitted), and there are "methodological distinctions that divide . . . hard sciences" from "soft" sciences, i.e., social

_____

[4] See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 585-595 (1993); Commonwealth v. Lanigan, 419 Mass. 15, 25-26 (1994).

sciences. Hinds, supra at 222. "[A]pplication of the Daubert-Lanigan standard to soft sciences requires flexibility with special attention being paid to the criteria of reliability that different disciplines develop." Id., citing Canavan's Case, 432 Mass. 304, 314 n.5 (2000).

"Whether the methodology applied by the expert satisfies gatekeeper reliability is a preliminary question of fact," and we review the judge's determination for abuse of discretion. Hinds, supra at 218. "[O]ur review under this standard is deferential and limited, [but] it is not perfunctory. A judge's findings must apply the correct legal standard to the facts of the case and must be supported by an examination of the record" (quotation and citation omitted). Id. See generally L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014) (abuse of discretion is "clear error of judgment in weighing" relevant factors such that "decision falls outside the range of reasonable alternatives").

Here, at a voir dire hearing, Hirsch testified that he had a law degree but no education or training in psychology or psychiatry. His principal expertise was in interrogation methods. He asserted that false confessions occur with "surprising frequency," but he could not estimate their

frequency in numerical terms.[5]  He identified three types of false confessions:  (1) "the coerced-compliant false confession in which a suspect under interrogative pressure concludes that the best or only way of getting out of a despairing situation is to confess"; (2) "the internalized false confession, which is also typically in an interrogation situation, where the suspect actually comes to believe that he committed the crime or may have, even though he did not"; and (3) "the voluntary false confession . . . [involving] someone who will come forth either completely outside of an interrogative situation or without any interrogative pressure and claim to have committed a crime that he did not."  See generally Commonwealth v. Hoose, 467 Mass. 395, 415 n.10 (2014) (noting these types of false confessions). Only the third category, voluntary false confessions, was asserted to be relevant here.

Hirsch explained that voluntary false confessions could be motivated by a desire for notoriety in high-profile cases, the desire to protect another person, mental illness, or feelings of guilt about other crimes.  Hirsch testified that voluntary false confessions to protect another had been seen "anecdotally" but that he had "no idea about the[ir] frequency."  Neither Hirsch

---

[5] The closest he came was to cite a study in which six hundred professional investigators had been asked how often they thought innocent suspects confessed falsely during interrogation; the average of their estimates was 4.78 percent.

nor any other researcher had ever conducted a study focused on this type of false confession. In answer to the judge's question about how his testimony could assist the jury in this case, Hirsch said that false confessions are "deeply counterintuitive" and difficult for lay people to understand, so he would explain that they were "surprisingly frequent" and that "protecting someone is something that is in the literature."

In allowing the Commonwealth's motion to exclude Hirsch's testimony, the judge found that "his published scholarly works are few [and] not recent." Moreover, although voluntary false confessions to protect another had been mentioned in "some 'literature,'" Hirsch neither had conducted nor knew of any study focused on this type of confession. "Nothing presented in the voir dire hearing show[ed] that Hirsch's proposed testimony [about this type of false confession] [was] based on principles and methods that are generally accepted in the relevant scientific community or that they have otherwise been shown to be reliable or valid."

The judge also considered Hoose, 467 Mass. at 413-420, where the court affirmed the exclusion of a defendant's proffered expert testimony on false confessions in connection with interrogations. In the course of doing so, the Hoose court observed that such testimony might be found sufficiently reliable to be admissible in a future case "where several of the

false confession factors thus far identified are present." Id. at 420. See id. at 415 n.11, 418 (discussing factors including impaired mental or physical condition, police use of false evidence or offers of leniency, and social isolation). The judge concluded that because none of those factors was present here, the defendant's reliance on Hoose was unavailing.[6]

We see no abuse of discretion in the judge's decision. Hirsch offered no reliable information or even an opinion on how often voluntary false confessions to protect another occur (as opposed to other types of false confessions) or on what factors might make them more likely. Although in the social science context we pay "special attention . . . to the criteria of reliability that different disciplines develop," Hinds, 487 Mass. at 222, Hirsch did not describe, nor does the defendant identify, any reliability criteria that any relevant discipline has developed regarding Hirsch's proposed testimony. Further, as the judge's discussion of Hoose suggested, testimony about other types of false confessions would have been of dubious relevance here.

---

[6] We add that Hoose, involving a confession after interrogation, did not focus on whether the factors discussed therein would necessarily be relevant in a case, like this one, of an assertedly false voluntary confession made to protect another.

2.  Prior bad act evidence.  The defendant next argues that the judge abused his discretion in admitting evidence that the defendant had intentionally caused M.C.'s TPN line infections in 2009.  The defendant also argues that, once the judge decided to admit that prior bad act evidence, he further abused his discretion by denying two defense motions aimed at countering it.  None of these arguments persuades us.

a.  2009 bad acts.  The defendant filed a motion in limine to exclude (1) the part of his 2015 confession in which he admitted causing M.C.'s infections in 2009 by dipping her TPN line in stool at Tufts Medical Center, and (2) Dr. Meissner's testimony that M.C.'s 2009 infections were likely caused by dipping her TPN line in stool.[7]  The Commonwealth argued in opposition that the 2009 evidence was probative of whether the defendant, as he had confessed before recanting, put Liquid Plumr into M.C.'s C-tube in 2015.  The judge agreed, ruling that the 2009 evidence was "highly probative of his intent, motive, knowledge and opportunity that, six years earlier, he introduced a harmful substance into his daughter's medical tubing with the

---

[7] On cross-examination, Dr. Meissner acknowledged having previously testified in the 2009 care and protection case that he had no opinion on whether the bacteria found in M.C.'s bloodstream had been intentionally introduced by another person. Even if the defendant had argued this point in support of his motion in limine, it went only to the weight of Dr. Meissner's testimony, not its admissibility.

intent to kill her." The judge further considered whether the probative value was outweighed by the risk of unfair prejudice; concluding that it was not, he denied the defendant's motion in limine.[8]

Evidence of other bad acts is inadmissible to prove the defendant's "bad character or propensity to commit the crime charged, but such evidence may be admissible if relevant for some other purpose . . . , such as to show a common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive" (citations omitted). Commonwealth v. Helfant, 398 Mass. 214, 224 (1986). Even if relevant for one of these purposes, such evidence "will not be admitted if its probative value is outweighed by the risk of unfair prejudice to the defendant." Commonwealth v. Crayton, 470 Mass. 228, 249

---

[8] At the time the evidence was admitted, the judge instructed the jury about the limited purposes for which it could be considered, including for the existence of a "pattern of conduct." Although the defendant did not object at the time, it appears that he did so when later reviewing a draft of the judge's final charge. In response, the judge altered the charge and emphatically instructed the jury to disregard, as erroneous, his previous mentions of a pattern of conduct. On appeal, the defendant argues for the first time that the final instruction was insufficient to cure the asserted harm flowing from the earlier instructions. We see no reason not to presume that the jury followed the final instruction; if there was any error, we see no substantial risk of a miscarriage of justice. Cf. Commonwealth v. Beaudry, 445 Mass. 577, 587 (2005) (where curative instruction is requested and given, party believing it insufficient must object, or issue is waived).

(2014). Although that balancing is to consider the incremental probative value of the bad acts evidence, see Commonwealth v. Brown, 389 Mass. 382, 385-386 & n.7 (1983), "the Commonwealth [is] not required to show that it need[s] the prior bad act evidence to prove its case," Commonwealth v. Copney, 468 Mass. 405, 413 (2014). Whether to admit such evidence is "committed to the sound discretion of the trial judge and will not be disturbed by a reviewing court absent palpable error" (quotation and citation omitted). Commonwealth v. McCowen, 458 Mass. 461, 478 (2010).

i. Probative value. The defendant argues that the 2009 evidence had no probative value on the issues of his motive, intent, knowledge, or opportunity, because "none of [them] were in dispute." He points out that the jury had heard him admit in his recorded confession that in 2015, with the motive of putting M.C. out of her misery, he intentionally put drain cleaner in her C-tube in order to kill her.

His position at trial, however, was that his confession was a lie -- that he "lived for" M.C. and "ha[d] never hurt" her. Whether he had any motive to harm her, and whether he acted intentionally on that motive, were very much in dispute. The judge could reasonably view the evidence that the defendant had confessed to having and acting on the same motive in 2009 by dipping M.C.'s TPN line in her stool -- along with corroborative

evidence that Dr. Meissner believed M.C.'s 2009 infections were caused by bacteria normally found in stool -- as highly probative of whether he had and acted on the same motive and intent in 2015. This was a sufficient nonpropensity basis on which to admit the 2009 evidence.[9] See Commonwealth v. Keown, 478 Mass. 232, 244 (2017), cert. denied, 138 S. Ct. 1038 (2018) (defendant's embezzlement and lies years before wife's murder by poisoning with antifreeze admissible to show his state of mind, motive, and intent). Without the 2009 evidence, the defendant's putting drain cleaner into M.C.'s C-tube in 2015 "could have appeared to the jury as an essentially inexplicable act of violence." Commonwealth v. Melendez, 490 Mass. 648, 663 (2022), quoting Commonwealth v. Mendes, 441 Mass. 459, 464 (2004).

We are not persuaded by the defendant's argument, made for the first time on appeal, that the 2009 evidence had no probative value because "one extrajudicial confession may not corroborate another extrajudicial confession." Commonwealth v.

_____

[9] We thus need not decide whether admission of that evidence on the issues of knowledge or opportunity was also proper. The defendant points out that his knowledge of and opportunity to tamper with M.C.'s C-tube was undisputed. The Supreme Judicial Court has recently "emphasize[d] the importance of specificity and precision in the context of ruling on bad act evidence" and has cautioned against "justifying the admission of bad act evidence simply by reciting a list of permissible nonpropensity purposes that have been previously accepted." Commonwealth v. Samia, 492 Mass. 135, 148 n.8 (2023).

Costello, 411 Mass. 371, 375 (1991).  Costello involved the rule that, for purposes of evaluating the sufficiency of the evidence, "a conviction cannot be based solely [o]n evidence of a defendant's uncorroborated extrajudicial confession."  Id. at 374, citing Commonwealth v. Forde, 392 Mass. 453, 457-458 (1984).  Here, the Forde corroboration of the defendant's confession to putting drain cleaner in M.C.'s C-tube was provided not by the 2009 evidence but by Dr. Ozgediz's testimony that M.C.'s 2015 injuries were caused by a caustic substance. In other words, the Commonwealth met the Forde requirement with medical evidence, rather than attempting to meet it with evidence of another confession, as in Costello.  The Commonwealth offered the defendant's confession to having tried to kill M.C. in 2009 not to provide Forde corroboration[10] but for the narrower purpose of showing that, because he had the motive and intent to kill M.C. in 2009, the defendant was more likely

---

[10] The defendant's confession to having tried to kill M.C. in 2009 did not require corroboration in the Forde sense, because he was not being tried for any charge based on the 2009 events.  In any event, Dr. Meissner's testimony provided that corroboration, and was relevant to a disputed issue, because the defendant had recanted that confession and the Commonwealth was entitled to show with medical evidence that the confession was true.

to have had the same motive and intent in 2015. Costello is thus inapposite here.[11]

We also reject the defendant's argument based on the superficially similar case of Brown, 389 Mass. 382, which involved allegedly fabricated confessions both to charged conduct and to similar prior bad acts. Id. at 383-386. Although the court held that the evidence of confessions to the prior bad acts should not have been admitted, it did not adopt any general rule about the probative value of such evidence. Id. at 385-386. The court held only that in the particular circumstances of that case, the confessions to the four charged offenses were adequate to achieve the Commonwealth's stated purpose of proving a common scheme or plan, and so the incremental probative value of the confessions to the prior bad acts was minimal and did not outweigh the resulting undue prejudice. Id. That case-specific analysis is inapplicable here.

ii. Risk of unfair prejudice. The judge reasonably balanced the probative value of the 2009 evidence against the potential for unfair prejudice. "Relevant evidence is presumed

---

[11] Costello is also inapposite because there the Commonwealth sought to corroborate a confession to crimes with evidence that the defendant had made a second confession to those same crimes, not to an earlier crime. Costello, 411 Mass. at 373-374.

to be prejudicial or harmful to the party against whom it is offered, but exclusion is warranted only when the prejudice is unfair. . . . Unfair prejudice may result when jurors are unnecessarily exposed to inflammatory evidence that might cause them to decide the case based on emotion" (citations omitted). Mass. G. Evid. § 403 note (2023).

Here, the emotional impact of the bad act evidence flowed from the defendant's own admission -- as part and parcel of his later-recanted confession to having tried to kill M.C. in 2015 -- that he had also tried to kill her in 2009. The judge could reasonably have concluded that the disturbing nature of the 2009 acts to which the defendant confessed would not distract the jury from the central question, which was whether to believe his confession or his recantation. "It has long been held that, in balancing the probative value against the risk of [unfair] prejudice, the fact that evidence goes to a central issue in the case tips the balance in favor of admission." Commonwealth v. Jaime, 433 Mass. 575, 579 (2001).

b. Delay of trial. Once the judge ruled on January 23, 2020 (eleven days before trial), that evidence of the 2009 acts would be admitted, the defendant moved to stay the proceedings to allow him time to obtain an infectious disease expert to help counter Dr. Meissner's expected testimony. The motion asserted that, until the judge's ruling, the defendant "had no reason to

believe that events from 2009[] would be relevant to events in 2015." The judge denied the motion. The defendant argues that this ruling unfairly prevented him from effectively cross-examining Dr. Meissner. We are unpersuaded.

"The decision whether to grant a motion to continue lies within the sound discretion of the trial judge" and is reviewed for abuse of that discretion. Commonwealth v. Miles, 420 Mass. 67, 85 (1995). "However, a trial judge may not exercise his discretion in such a way as to impair a defendant's constitutional right to have counsel who has had reasonable opportunity to prepare a defense" (quotation and citation omitted). Id. In reviewing the judge's decision, we focus in particular on the "reasons presented to the trial judge" (quotation and citation omitted). Id. See Commonwealth v. Super, 431 Mass. 492, 497 (2000).

Here, the record belies the defendant's claim that, until late January of 2020, he had no reason to believe that the events of 2009 would be at issue. On September 4, 2019, the Commonwealth filed a three-page anticipated witness list identifying Dr. Meissner, among others from Tufts Medical Center, as a witness on the issue of the defendant's other bad acts. On September 18, 2019, the Commonwealth filed a notice of its intention to call Dr. Meissner as an expert witness to offer opinions regarding M.C.'s 2009 blood infections and their

causes. At a hearing on September 20, 2019, the Commonwealth confirmed this intention. On October 24, 2019, on the defendant's motion for disclosure of prior bad acts the Commonwealth expected to offer at trial, the judge struck the Commonwealth's submissions mentioned above, essentially on the ground that they did not describe the evidence with sufficient specificity. The judge ordered the Commonwealth to file a new and more detailed description of that evidence. The Commonwealth did so on December 19, 2019, more than six weeks before trial, and once again stated that Dr. Meissner would testify regarding M.C.'s blood infections. The defendant's brief acknowledges that this response was "appropriate[]."

The judge could thus have concluded that, although the Commonwealth's disclosures were at times deficient, the defendant knew as early as five months before trial, and certainly no later than six weeks before trial, that the Commonwealth would call Dr. Meissner to testify. Indeed, the fact that, on January 13, 2020, the defendant filed the motion in limine to preclude that testimony showed he was on notice that the evidence might otherwise be admitted. Although he no doubt hoped that the motion would be allowed, he could not rely on that hope. Thus, upon denying the motion in limine, the judge did not abuse his discretion in rejecting the defendant's claim, eleven days before trial, that he needed a stay because

he previously had "no reason to believe" that Dr. Meissner would testify.  Moreover, the defendant did not, and on appeal does not, identify any specific issue on which the lack of a defense expert prevented him from effectively cross-examining Dr. Meissner.[12]

      c.  Evidence of order ending 2009 care and protection case. The defendant argues that, after the judge admitted the 2009 bad acts evidence, he abused his discretion by denying the defendant's motion that he take judicial notice, and allow the jury to hear, of the order that ended the 2009 care and protection case.  That one-page order, issued by a Juvenile Court judge in March 2011, dismissed the case because the defendant and his wife "were found to be fit" parents and "there was no need for an adjudication of [c]are and [p]rotection." The Commonwealth opposed the motion on two grounds: (1) although the content of the 2011 order was undisputed, it represented the Juvenile Court judge's opinion and so was not relevant; and (2) the jury had already heard evidence that the

_____

[12] The judge also could have considered whether, between the time the defendant was indicted in August of 2015, and the scheduled beginning of the trial in February of 2020, trial counsel had gained sufficient knowledge of M.C.'s medical history, and various experts' views of it, to cross-examine Dr. Meissner effectively without the assistance of an additional expert.  Our review of the transcript suggests that counsel did so with considerable skill.

defendant and his wife, after losing custody of M.C. to DCF for eighteen months starting in 2009, had regained custody after a trial and a judge's order. The judge denied the motion for the reasons argued by the Commonwealth.

This ruling was within the judge's discretion. The 2011 order represented the Juvenile Court judge's opinion that DCF failed to meet its burden of proving the allegations of unfitness in the 2009 care and protection case. That opinion was of marginal, if any, relevance to the issues in this case. The defendant's sole assertion of relevance is that the jury here were entitled to learn that "another judicial body found Dr. Meissner's allegations untrue." But nothing in the 2011 order did any such thing; the order did not mention Dr. Meissner or his allegations. Moreover, even if the Juvenile Court judge did not credit Dr. Meissner's testimony in that case -- something that cannot be determined from the 2011 order -- the credibility of Dr. Meissner's testimony in this case was a matter for this jury.[13]

---

[13] The defendant's reliance in this connection on Commonwealth v. Fayerweather, 406 Mass. 78 (1989), is unavailing. There the court held that it was error to exclude evidence in a psychiatric hospital record, including statements by the complaining witness, that bore directly on her ability to accurately perceive her interactions with the defendant and that was offered to impeach her trial testimony. Id. at 81-83 & n.1.

3. <u>Statement of intention to confess</u>. The defendant argues that the judge abused his discretion in precluding the defendant's attorney in his 2015 care and protection case from testifying that the defendant told her of his intention to confess. Specifically, the attorney would have testified that on May 8, 2015 -- twelve days before he confessed -- the defendant said to her, "I am going to give the [d]istrict [a]ttorney a confession. I didn't do it. But this is what we do for our family."[14] The Commonwealth moved in limine to preclude as hearsay the attorney's testimony that the defendant made that statement. The defendant argued, as relevant here,[15] that his statement fell within the state of mind exception for statements indicating an intention to engage in particular conduct. See <u>Commonwealth</u> v. <u>Avila</u>, 454 Mass. 744, 767 (2009). The judge ruled that the exception was inapplicable. We conclude that the judge did not abuse his "broad discretion in determining whether [this] hearsay exception applies" (citation omitted). <u>Commonwealth</u> v. <u>Yat Fung Ng</u>, 491 Mass. 247, 260 (2023) (discussing state of mind exception).

---

[14] We adopt the punctuation used in the parties' motion papers, but nothing turns on it. Our ruling would be the same if the three phrases appeared in a single sentence, separated by different punctuation, or linked by different conjunctions.

[15] The defendant has not pressed on appeal the other grounds for admissibility he argued to the judge.

"Statements, not too remote in time, which indicate an intention to engage in particular conduct, are admissible to prove that the conduct was, in fact, put in effect. Statements of memory or belief to prove the fact remembered or believed do not fall within this exception." Mass. G. Evid. § 803(3)(B)(ii). See Commonwealth v. Britt, 465 Mass. 87, 91 (2013); Commonwealth v. Fredette, 97 Mass. App. Ct. 206, 219-220 (2020).

Here, the judge reasoned that the only part of the defendant's statement expressing an intention to engage in "conduct" was, "I'm going to give the [d]istrict [a]ttorney a confession." The judge ruled that this statement was inadmissible "simply because it's not relevant" that the defendant told a third party he was going to confess. On appeal, the defendant does not challenge this aspect of the judge's analysis.

The parts of the statement that the judge viewed as "of particular value to the defense" were, "I didn't do it," and, "this is what we do for our family." The defendant wished to show not that he had confessed but that his confession was false and to explain why he had made it. The judge ruled that those parts "aren't conduct," which we take to mean that they did not express an intention to engage in conduct.

This ruling was within the judge's "broad discretion." Yat Fung Ng, 491 Mass. at 260. The statement, "I didn't do it," does not contemplate future conduct. Rather, it states the defendant's memory or belief and was offered to prove the fact remembered or believed (that he did not "do it"). Thus, the statement "do[es] not fall within th[e] exception." Mass. G. Evid. § 803(3)(B)(ii). "Th[e] exception applies only to the declarant's present intent to act, not to past conduct." Commonwealth v. Pope, 397 Mass. 275, 281 (1986) (suicide note stating, "I killed Jimmy," did not disclose intent to kill in future and so not within exception). See Commonwealth v. Bianchi, 435 Mass. 316, 327 & n.15 (2001) (suicide note purporting to explain past conduct inadmissible under state of mind exception); Fredette, 97 Mass. App. Ct. at 219-220. See also M.S. Brodin & M. Avery, Massachusetts Evidence § 8.8, at 635 (2019 ed.). And the statement, "this is what we do for our family," offered to explain why the defendant intended to confess, was no more relevant than the statement of intent itself.[16]

---

[16] The defendant argues that his entire statement should have been admitted under the doctrine of verbal completeness. But that doctrine applies only where there is a need to explain a portion of a statement already admitted in evidence, which was not the case here. See Crayton, 470 Mass. at 246-247. Likewise, the defendant's argument that relevant statements must

The defendant's reliance on Commonwealth v. Vermette, 43 Mass. App. Ct. 789 (1997), has some force but ultimately is unavailing. In Vermette, the defendant, charged with a shooting, introduced third-party culprit evidence that one Gonsalves had confessed to the shooting. Id. at 792-793 & n.3. The Commonwealth then introduced evidence that Gonsalves, deceased by the time of trial, had told a witness that he (Gonsalves) "was going to get $400,000 for 'taking the rap' for the shooting" and that "'he was going to make tapes and letters and fake his death,' after which the defendant's father would fly him to the Bahamas." Id. at 796. Police later discovered Gonsalves's body along with letters and tape recordings in which he confessed to the shooting. Id. at 792-793. The Commonwealth offered Gonsalves's earlier statements to the witness "to show that he, Gonsalves, intended to lie and confess to [the shooting], a showing from which the jury could infer that his subsequent statements, the letters and the tapes, were the doing of the intended act, viz., lying. As such, they were properly admitted" as statements of Gonsalves's intention. Id. at 801-802.

---

be given context presupposes that some part of his statement was relevant and admissible in the first place.

We acknowledge that Vermette, like this case, involved a statement of intention to confess along with an implication that the confession would be false. The critical statements in Vermette, however, expressed the declarant's intention to engage in future conduct,[17] whereas the critical statement here, "I didn't do it," is purely about the past. "Declarations of intention, casting light upon the future, have been sharply distinguished from declarations of memory, pointing backwards to the past. There would be an end, or nearly that, to the rule against hearsay if the distinction were ignored." Shepard v. United States, 290 U.S. 96, 105-106 (1933). See Commonwealth v. Lowe, 391 Mass. 97, 104-106, cert. denied, 469 U.S. 840 (1984) (emphasizing this distinction). The defendant's out-of-court statement denying past conduct, which he plainly offered for the truth of the denial, did not become admissible merely because he accompanied it with a statement -- irrelevant here -- that he intended to confess to that conduct.[18]

4. Motion for new trial. The defendant's motion for a new trial asserted that trial counsel was ineffective in four ways:

---

[17] The admissibility of the statement that the defendant's father would fly the declarant to the Bahamas was not separately considered. Vermette, 43 Mass. App. Ct. at 800-802.

[18] Ruling as we do, we need not address whether the defendant's statements, made twelve days before his confession, were too remote in time to be admissible.

(1) by failing to offer a prior consistent statement of the defendant in order to rehabilitate his credibility after cross-examination, (2) by failing to object to Dr. Ozgediz's testimony that he was "a hundred percent certain" of the cause of M.C.'s injuries, (3) by failing to object to the Commonwealth's cross-examination of the defendant, and (4) by failing to object to factual inaccuracies in the Commonwealth's closing argument.  In a thorough written decision, the judge rejected each of these claims.

We review the judge's decision for "a significant error of law or other abuse of discretion," and we "extend[] special deference to the action of a motion judge who was also the trial judge."  Commonwealth v. Grace, 397 Mass. 303, 307 (1986).  To prevail on a claim of ineffective assistance of counsel, the defendant must establish that counsel's performance fell "measurably below that which might be expected from an ordinary fallible lawyer" and "likely deprived the defendant of an otherwise available, substantial ground of defence."  Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).

a.  Prior consistent statement.  The Commonwealth's cross-examination sought to cast doubt on the defendant's testimony that his 2015 confession was false.  The defendant argued that trial counsel was ineffective in failing to rebut this attack by offering the defendant's pre-confession statement to his care

and protection attorney that he "didn't do it" but was confessing for the sake of his family.  The judge ruled that the statement would have been inadmissible in any event because it had not been made before the defendant had a motive to fabricate, and thus counsel was not ineffective in failing to offer it.  See Commonwealth v. Lally, 473 Mass. 693, 703 n.10 (2016) (not ineffective to decline to file motion that would not have materially aided defense).  We see no error or other abuse of discretion in this ruling.

A prior consistent statement is usually inadmissible, because "the testimony of a witness in court should not need -- and ought not -- to be pumped up by evidence that the witness said the same thing on some prior occasion" (quotation and citation omitted).  Commonwealth v. Morales, 483 Mass. 676, 678 (2019).  However, "[i]f the court makes a preliminary finding that there is a claim that the witness's in-court testimony is the result of recent contrivance or a bias, and the prior consistent statement was made before the witness had a motive to fabricate or the occurrence of the event indicating a bias, the evidence may be admitted for the limited purpose of rebutting the claim of recent contrivance or bias."  Mass. G. Evid. § 613(b)(2).  See Commonwealth v. Caruso, 476 Mass. 275, 284 (2017).

The use of prior consistent statements for this purpose "should be allowed only with caution, and where the probative value for the proper purpose is clear" (quotation and citation omitted). Commonwealth v. Lareau, 37 Mass. App. Ct. 679, 683 (1994). The test is "one of probative value[:] whether the prior consistent statement has a logical tendency to meet and counter the suggestion that the witness has recently contrived his testimony for purposes of trial." Commonwealth v. Darden, 5 Mass. App. Ct. 522, 530 (1977). "In making that determination, a measure of discretion must be given to the trial judge . . . , who is in a better position than an appellate court to evaluate the subtleties and nuances of the trial . . ." (citation omitted). Id. See Caruso, 476 Mass. at 285; Lareau, supra.

Here, the judge ruled that, although the Commonwealth had indeed argued that the defendant's claim of the confession's falsity was a contrivance, the defendant already had a motive to claim its falsity when he spoke to his care and protection attorney. That motive was "to avoid conviction." The defendant testified that, before he confessed, he knew that he would be arrested once he did so. Therefore, as the judge put it, when the defendant spoke to the attorney, he already had a "motive to

undermine the confession he was about to give."[19] Contrary to the defendant's argument that a person (such as himself) without legal training would not be motivated to make such statements, we have previously recognized the danger that once a "witness has a reason to build up his position," the witness may "know[] that repetitions of his claims may be helpful later to blunt the force of an accusation that he is fabricating his testimony." Commonwealth v. Healey, 27 Mass. App. Ct. 30, 35 n.5 (1989). The prior consistent statement doctrine is structured to exclude such statements. See id.

Although the defendant may have had an additional, potentially conflicting motive for making the confession itself,[20] the defendant does not dispute that establishing the

-----

[19] We reject the defendant's argument that the Commonwealth claimed at trial that "it was only now," i.e., at the time of trial, "that he was facing conviction and his daughter had been permanently taken away that [he] was recanting" his confession. Nothing in the record supports this argument. The defendant testified that he knew before he confessed that the confession would lead to his arrest and the loss of custody of M.C.

[20] As the judge recognized, the defendant claimed another motive: "a motive to confess -- in order to (as he testified) ensure that [his daughter] would remain in at least her mother's custody." That motive was in tension with his motive to avoid conviction; recanting might also jeopardize his stated goal of getting "DCF [to] back off of my wife [so] that my daughter could go back to her mom [and] grow up with . . . one parent rather than none." But the Commonwealth was not required to present an internally consistent explanation of all the defendant's possible motives.

falsity of his confession would have reduced the likelihood of conviction. And the motive that the Commonwealth suggested he had at trial -- to falsely claim the confession's falsity in order to avoid conviction -- could, if it existed at all, logically also be thought to have existed at the time he made his statement to his care and protection attorney. The judge did not abuse his discretion in so concluding.

Accordingly, if the defendant's 2015 confession was false, his prior statement to the attorney that it was going to be false did not logically rebut the Commonwealth's suggestion that he recanted the confession at trial only to avoid conviction. The defendant made that prior statement at a time when he already wanted to avoid conviction, and thus it was not "made before the witness had a motive to fabricate." Mass. G. Evid. § 613(b)(2).

Contrary to the defendant's argument, the judge's analysis did not rest on any implicit conclusion that the confession was true and that the defendant lied about its being false. Those were obviously jury questions. Nor did the judge conclude that the Commonwealth was correct in suggesting that the defendant's testimony was motivated by the desire to avoid conviction. The question before the judge was not one of fact, but solely one of logic and probative value: whether the defendant's prior consistent statement "ha[d] a logical tendency to meet and

counter the suggestion that [he had] recently contrived his testimony for purposes of trial" (emphasis added).  Darden, 5 Mass. App. Ct. at 530.  The judge did not abuse his discretion in concluding that because the prior statement had no such logical tendency, offering it in evidence would have been futile and counsel was not ineffective in failing to do so.  See Lally, 473 Mass. at 703 n.10.

b.  Dr. Ozgediz's testimony.  The defendant argued that counsel should have objected to Dr. Ozgediz's testimony that he was "a hundred percent certain" that M.C.'s injuries were caused by a chemical.[21]  Although the judge agreed that the testimony was "improper," he rejected this claim of ineffective assistance on the ground, among others, that even if counsel's failure to object was not strategic, the defendant had not shown sufficient prejudice.[22]

---

[21] The defendant argued that counsel should also have objected to Dr. Ozgediz's use of the phrase "a hundred percent" in testifying that in his opinion, M.C.'s C-tube could have been flushed with saline solution a day after a caustic substance had been introduced into the C-tube.  The judge acknowledged the argument but did not analyze it separately.  The defendant makes no separate argument regarding this statement, and we conclude that no separate analysis is required.

[22] We pass over the judge's rulings that, although an objection would likely have been sustained, counsel's decision not to object could have been strategic.

The judge ruled that the over-all impact of a successful objection "would likely have been minimal." He reasoned as follows:

> "This was one statement . . . made in the context of hours of testimony from Dr. Ozgediz regarding his treatment of [M.C.], his attempts to discover the source of her injuries, and the factual and scientific basis for his conclusion that they were caused by the injection of a caustic substance into her cecostomy tube. This plethora of evidence would still have been before the jury even if the improper 'one hundred percent' statement had been stricken. Its admission did not deprive [the defendant] of an otherwise-available defense -- indeed, he ably and amply challenged Dr. Ozgediz's opinion with three experts of his own -- nor does it raise a significant concern that the jury would have otherwise reached a different conclusion."

On appeal, the defendant merely repeats the same prejudice arguments made in his motion for a new trial. Mindful of the "special deference" due a motion judge who was also the trial judge, Grace, 397 Mass. at 307, and concluding that the judge reached a reasonable decision after considering the relevant factors, L.L., 470 Mass. at 185 n.27, we reject the defendant's claim of an abuse of discretion.

c. Cross-examination of defendant. The defendant next argues that counsel should have objected to certain rhetorical questions the prosecutor posed in cross-examining the defendant. These included whether the defendant, who had cried during both his 2015 confession and his trial testimony recanting it, had "[t]aken theater courses" or "won an Oscar," and whether he felt "smug" after he slipped into an answer on cross-examination a

reference to his wife visiting him in jail, despite the judge's previous order excluding such testimony.

The judge, applying the standards in Commonwealth v. Murphy, 57 Mass. App. Ct. 586, 589-590 (2003), for evaluating assertedly inflammatory or degrading questions, agreed that the prosecutor's rhetorical questions were improper. He concluded, however, that trial counsel's failure to object did not "remotely" create the requisite prejudice for an ineffective assistance claim. The judge recognized that the prosecutor and the defendant had engaged in "vigorous verbal sparring" and that in some instances here, as in Murphy, "the defendant deflected the question by turning it back on the prosecutor." Murphy, supra at 591. On balance, the judge concluded that the improper questions "appear[] to have come and gone without fanfare." Id. The judge did not abuse his considerable discretion in so ruling.

d. Commonwealth's closing argument. Finally, the defendant argued that counsel was ineffective in failing to object to various asserted inaccuracies in the Commonwealth's closing argument. These concerned an entry on the defendant's work timesheet, the results of a computed tomography scan taken at YNHH, Dr. Ozgediz's testimony, and matters that called into question the credibility of the defendant's experts. The judge reviewed each of these claims in detail and concluded that, with

one minor exception, the prosecutor did not misrepresent the evidence. As for the exception, the judge ruled that the prosecutor's description of one statement by Dr. Ozgediz "may have been technically inaccurate from a medical standpoint, [but] it did not misstate or misrepresent the substance of Dr. Ozgediz's testimony."

We have carefully reviewed each of the defendant's arguments and the judge's careful resolution of them. No purpose would be served by repeating the judge's analysis. There was no abuse of discretion.[23]

Conclusion. We affirm the judgments and the order denying the defendant's motion for a new trial.

So ordered.

---

[23] We are unpersuaded by the defendant's further argument that even if no single error warrants relief, the cumulative effect of the asserted errors justifies a new trial.